## In re MULTIDISTRICT VEHICLE AIR POLLUTION.*

### STATE OF WASHINGTON et al., Plaintiffs-Appellants,

v.

### AUTOMOBILE MANUFACTURERS ASSOCIATION et al., Defendants-Appellees.

### No. 74–1706.

United States Court of Appeals, Ninth Circuit.

June 15, 1976.

As Amended June 25, 1976.

* Consolidated with:
New York City, 74–1733; State of Missouri, 74–1734; Commonwealth of Virginia, 74–1735; State of Vermont, 74–1736; State of Texas, 74–1737; State of Florida, 74–1738; State of Louisiana, 74–1739; State of South Dakota, 74–1740; State of Alabama, 74–1741; Commonwealth of Kentucky, 74–1742; State of Arizona, 74–1743; State of California, 74–1744; State of Wisconsin, 74–1752; City of Philadelphia, 74–1753; State of New Mexico, 74–1754;

232

State of New Jersey, 74–1755; State of Connecticut, 74–1756; City & County of Denver, 74–1757; Grossman, 74–1758; County of Lackawanna, Pa., 74–1764; Commonwealth of Pennsylvania, 74–1765; State of New York, 74–1767; Commonwealth of Massachusetts, 74–1790; State of Ohio, 74–1835; State of Kansas, 74–1892; v. Automobile Manufacturers Association.

tion, and patenting of automobile pollution control devices. Appellants claim that this conspiracy has resulted in millions of automobiles being driven without effective emission control devices, which in turn has been the most significant cause of the nation's air pollution problem.

The United States, through the Department of Justice, first brought an action in 1969, claiming that there was cooperation among the automakers and their association for the purpose of delaying pollution control technology, a restraint of trade in violation of § 1 of the Sherman Act. That action resulted in a consent judgment entered that same year in which the automakers agreed to terminate their cooperative efforts, but without admitting that their prior conduct had violated the law. *United States v. Automobile Mfgrs. Ass'n,* C.D.Cal., 1969, 307 F.Supp. 617, *aff'd sub nom. City of New York v. United States,* 1970, 397 U.S. 248, 90 S.Ct. 1105, 25 L.Ed.2d 280.

Dissatisfied because they claimed that the consent decree did nothing to remedy the continuing effects of the automakers' past cooperation, the appellants, twenty-two states and certain counties, cities, and individuals, brought suits claiming the same violation as that alleged by the government in its action, and seeking both damages under § 4 of the Clayton Act, 15 U.S.C. § 15, and various equitable remedies under § 16 of the Clayton Act, 15 U.S.C. § 26.[1] Even though most of the appellants were suing *in parens patriae* on behalf of their citizens, the district court denied the motion to dismiss the suits for lack of standing. We reversed that decision as to the § 4 damage claim, but agreed that states did have standing as *parens patriae* to seek equitable relief under § 16.[2] *In re Multidistrict Vehicle Air Pollution M.D.L. # 31,* 9 Cir., 1973, 481 F.2d 122, 131.

Frederic C. Tausend (argued), of Schweppe, Doolittle, Krug, Tausend, Beezer & Beierle, Seattle, Wash., and Anthony C. Joseph, Deputy Atty. Gen. of State of Cal. (argued), Los Angeles, Cal., for plaintiffs-appellants.

Lloyd N. Cutler (argued), of Wilmer, Cutler & Pickering, Washington, D. C., for defendants-appellees.

OPINION

Before DUNIWAY, GOODWIN and WALLACE, Circuit Judges.

DUNIWAY, Circuit Judge:

In these consolidated cases, appellants appeal from the dismissal of their actions charging violations of § 1 of the Sherman Act and seeking equitable relief under § 16 of the Clayton Act. The district court based the dismissal on the ground that the remedies sought under § 16 are not available under the unique facts of these cases. We affirm.

I. *The Factual Background.*

Appellants charge that, beginning in 1953 and continuing into 1969, the nation's four largest automobile manufacturers, who are defendants, conspired through their trade association, also a defendant, to suppress the development of automobile antipollution technology and thereby to eliminate competition among themselves in the research, development, manufacture, installa-

1. The actions were transferred to the Central District of California for coordinated or consolidated pretrial proceedings. *In re Motor Vehicle Air Pollution Control Equipment, Jud. Panel. Mult. Lit.,* 1970, 311 F.Supp. 1349. *See also, id., M.D.L. No. 31,* C.D.Cal., 1970, 52 F.R.D.

398. *Cf. Washington v. General Motors,* 1972, 406 U.S. 109, 92 S.Ct. 1396, 31 L.Ed.2d 727.

2. We explicitly noted that our decision intimated no conclusions about either the merits of the cases or the availability of the remedy sought. 481 F.2d at 131.

Following our decision, the appellants sought only various equitable remedies under § 16. The two remedies which they most vigorously pursue, and to which they devote nearly all of their attention before us, are (1) an order requiring the appellees to "retrofit,"[3] without charge or at a reduced charge, all automobiles still in operation which they produced without effective pollution control devices, and (2) "restitution," i. e., payment, to those persons who have already had their vehicles retrofitted of the amounts paid by them for such retrofitting. The district court, on its own motion, held a hearing under F.R.Civ.P. Rule 16 to determine whether the remedies sought were available to the appellants under § 16 of the Clayton Act. It dismissed the actions upon finding that the remedies were not available. *In re Multidistrict Vehicle Air Pollution,* C.D.Cal., 1973, 367 F.Supp. 1298. We affirm.

## II. *The Restitution Remedy.*

The monetary award which the appellants seek for those persons who have already retrofitted their vehicles is not available under § 16.[4] That section reads [15 U.S.C. § 26]:

> § 26. Injunctive relief for private parties; exception
>
> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . . .

Appellants claim that reimbursing those persons who have paid for retrofitting their own vehicles is a form of "restitution," a remedy available in courts of equity.

■ While restitution is indeed an equitable remedy, § 16 limits the equitable remedies available under its terms to those against "threatened loss or damage." Here, the "reimbursement" would be awarded for the loss which has already occurred, at the time the car owner paid to have his vehicle retrofitted; it would not be relief "against threatened loss or damage." Recovery for past losses is properly covered under § 4; it comes under the head of "damages." *See Greenwood County v. Duke Power Co.,* 4 Cir., 1939, 107 F.2d 484, 487. What plaintiffs seek is not "restitution" in the sense in which that term is usually used. Defendants have not received from the car owners any money to which they are not entitled; plaintiffs do not claim that they have. Thus, whether payments which appellants seek for some of their citizens is "equitable" or not is of no consequence because § 16 does not allow the claimed relief for past loss.

## III. *The Retrofit Remedy.*

■ Appellants demand that the court order the appellees to retrofit all of the cars which the automakers produced without effective pollution control devices, asserting that § 16 permits the granting of affirmative injunctive relief for conduct now terminated in order to alleviate continuing noneconomic harms. Based on the following analysis, we hold that § 16 does not permit affirmative relief for past conduct for the purpose of achieving goals that are not related to the purposes of the antitrust laws.

■ There are three major antitrust functions which injunctive relief granted under § 16 might serve: (1) putting an end to the illegal conduct, (2) depriving violators of the benefits of their illegal conduct, and (3) restoring competition in the market place. *See Schine Chain Theatres, Inc. v. United States,* 1948, 334 U.S. 110, 128–29,

3. "Retrofit" is the installation of presently available pollution control devices on all automobiles not presently so equipped. It also includes updating certain pollution control devices to present day technological levels.

4. Although we have some doubt as to whether the appellants may properly represent *in parens patriae* its citizens who have individually paid for the installation of pollution control devices on their own cars, we need not and do not reach that issue.

68 S.Ct. 947, 92 L.Ed. 1245. In our opinion, relief under § 16 that does not serve any of these antitrust functions is not appropriate. We do not overlook a fourth function—to make whole those who have been injured by the conduct of the violators. That function is usually served by the § 4 remedy of treble damages.

Appellants are correct in arguing that § 16 may provide for relief for purposes other than restoring competition. In *Georgia v. Pennsylvania R. Co.*, 1945, 324 U.S. 439, 446–53, 65 S.Ct. 716, 89 L.Ed. 1051, the Court held that the State of Georgia could seek relief under § 16 to enjoin northern railroad companies from conspiring to fix discriminatory railroad rates to the detriment of Georgia's economy.[5] Georgia did not seek the injunction in order to restore competition among the railroads; rather, the purpose was to terminate the conspiracy and eliminate its results, thus improving the economic conditions of the state and its citizens. Similarly, the Sixth Circuit has held that a conspiracy by a board of realtors to exclude Blacks from purchasing homes in certain areas may be enjoined under § 16. An effect of an injunction would be to further civil rights policy, but the complaint charged impediments to the flow in interstate commerce of persons, mortgage financing and building materials. *Bratcher v. Akron Area Board of Realtors*, 6 Cir.,

1967, 381 F.2d 723. In those cases the injunctions were directed against a current ongoing conspiracy. Thus, the cases stand only for the proposition that § 16 provides relief which may have effects other than restoring competition when that relief has the effect of ending an ongoing antitrust violation, one of the functions of the antitrust laws.

Appellants may also be correct in claiming that § 16 permits, and in fact in some cases requires, that courts grant affirmative injunctive relief when merely ending illegal conduct will not end the harmful effects of the violation.[6] In actions in equity brought by the Justice Department under the remedial provisions of § 4 of the Sherman Act (15 U.S.C. § 4), the Supreme Court has approved or required divestiture for violations of § 7 of the Clayton Act, *Ford Motor Co. v. United States*, 1972, 405 U.S. 562, 573–78, 92 S.Ct. 1142, 31 L.Ed.2d 492; *United States v. duPont & Co.*, 1961, 366 U.S. 316, 326–34, 81 S.Ct. 1243, 6 L.Ed.2d 318 and for violations of §§ 1 and 2 of the Sherman Act, *Schine Chain Theatres, Inc. v. United States, supra,* 334 U.S. at 128–30, 68 S.Ct. 947, and it has also approved of requiring violators to license patents at prescribed rates and to sell products under prescribed terms for violations of §§ 1 and 2 of the Sherman Act, *United States v. Glaxo Group Ltd.,* 1973, 410 U.S.

**5.** Although the holding of the case was limited to the proposition that Georgia had standing to seek this relief under § 16, strong dictum in the opinion makes it clear that the Court felt that the injunction which Georgia sought was an appropriate remedy under § 16. Additionally, by granting Georgia standing to seek the remedy, the Court was inferring that the remedy was available; it would have been a futile gesture to read the language of § 16 as granting standing to seek a remedy which was necessarily unavailable under that same section. We emphasize, however, that under the unique facts of the present case, the same inference may not be drawn from our decision in *In re Multidistrict Vehicle Air Pollution M.D.L. # 31,* 9 Cir., 1973, 481 F.2d 122. See our discussion *infra,* at n.8 and accompanying text.

**6.** Up to now, all of these cases granting affirmative equitable relief have been cases brought by the government seeking remedies under § 4 of the Sherman Act, 15 U.S.C. § 4. It is not

clear what remedies available to the government are also available to private parties under § 16 of the Clayton Act. In *International T. & T. Corp. v. General T. & E. Corp.,* 9 Cir., 1975, 518 F.2d 913, 920–25, we held that, although available to the government under Sherman § 4, divestiture and dissolution were not available to private parties under Clayton § 16. In discussing the intent of Congress in passing § 16, we noted that:

> The committee viewed the provision of private injunctive relief as allowing "injunctive relief *only*" and not actions for dissolution. *Id.* at 922.

While the holding was limited to finding divestiture and dissolution unavailable under § 16, the reference to "injunctive relief *only*" could be interpreted as limiting § 16 to traditional negative injunctions. If so, the remedy sought in this case is doubly unavailable. However, we do not decide that question in this case.

52, 60–64, 93 S.Ct. 861, 35 L.Ed.2d 104, *United States v. United States Gypsum Co.,* 1950, 340 U.S. 76, 93–94, 71 S.Ct. 160, 95 L.Ed. 89. However, in each of these cases, and in all others permitting affirmative injunctive relief, the harm which the remedy was expressly designed to correct was a harm to the competitive system caused by the violation. Thus, these remedies, too, served one of the functions of the antitrust laws.

We recognize that affirmative remedies need not be limited to restoring the market to the *status quo ante*; if they were so limited, violators could continue to reap the benefits of their violation long after the illegal conduct ceased. District courts have "large discretion to model their judgment to fit the exigencies of the particular case," *International Salt Co. v. United States,* 1947, 332 U.S. 392, 400–01, 68 S.Ct. 12, 17, 92 L.Ed. 20, and they may require specific steps to eliminate the effects of the violation as well as merely to restore competition. But the Supreme Court has noted that the effects of the violation about which the law is concerned are those "offensive to the statute." *United States v. duPont & Co.,* 1957, 353 U.S. 586, 607, 81 S.Ct. 1243, 6 L.Ed.2d 318. Thus, in all of the cases to date, broad affirmative relief has been granted only where the threatened harm to be prevented is harm to the system which the antitrust laws were designed to protect, the competitive market system.

In a somewhat analogous case, *N.A.A. C.P. v. F.P.C.,* 1976, —— U.S. ——, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976), the Court held that the F.P.C., in carrying out its duties to fix just and reasonable rates for electricity and gas, can and should disallow or disregard costs incurred by utilities because of their indulging in discriminatory employment practices. But it also held that, even though the statutes required that the Commission take account of the public interest, that language "is not a directive to the commission to seek to eradicate discrimination" by the issuance of rules prescribing personnel practices or by acting as a surrogate Equal Employment Opportunity Commission. The Court also said: "This Court's cases have consistently held that the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare. Rather the words take meaning from the purposes of the regulatory legislation." So here, § 16 of the Clayton Act takes meaning from the purpose of the antitrust laws. It is not a broad license to the court to issue decrees designed to eliminate air pollution.

▪ In short, ongoing conduct may be enjoined for reasons that transcend the antitrust laws where the injunction serves one of the functions of those laws, i. e., ending ongoing violations. Likewise, affirmative equitable remedies may be granted to eliminate the harmful residual effects of past violations on the competitive system because that serves yet another function of the antitrust laws. However, the hybrid remedy sought here—affirmative equitable relief not involving ongoing violations and for the purpose of alleviating injury to something other than the competitive system—serves no antitrust purpose.

▪ Here, there are no ongoing violations to be ended. Appellants admit that the alleged illegal conduct was ended in 1969 with the consent decree and that in the pollution control market the auto producers are now "competing like crazy." *In re Multidistrict Vehicle Air Pollution, supra,* 367 F.Supp. at 1302 n.5. They also admit that the harm to be alleviated is environmental, not economic in the antitrust sense. Based upon these admissions, we must conclude that the remedy which the appellants seek in this case fails to serve any function of the antitrust laws.[7]

7. It might be argued that requiring the auto producers to retrofit at their own expense would have the effect of depriving them of the financial benefits of their conspiracy. Appellants do not make this claim. However, even if they had, that would not justify changing our holding. In the first place, prior cases seeking to deprive violators of the benefits of their violations were concerned with market power or position gained by the illegality; they have not been concerned with recovering only financial gains earned entirely in the past. Second-

Despite the fact that the remedy would serve no antitrust purpose, appellants claim that the language of § 16 does in fact contemplate this type of remedy. Specifically, they note that while § 4 limits monetary damages to someone "injured in his business or property," § 16 drops the "business or property" requirement and allows any person to get injunctive relief "against threatened loss or damage." Appellants claim that, by deleting the words "business or property," Congress intended to permit anyone threatened with injury arising from an antitrust violation, past or ongoing, to get any equitable relief which might be granted by a court of equity. We believe that this implies too much from the language of § 16.[8]

We recognized the significance of the difference in language of §§ 4 and 16 in the prior appeal, when we held that the present appellants do not have standing to sue *in parens patriae* under § 4, but do have standing under § 16 to seek equitable relief. *In re Multidistrict Vehicle Air Pollution M.D.L. # 31, supra,* 481 F.2d at 130–31. It can be argued that it would be a futile gesture to hold that appellants, who had no "business or property" interests lying within the "target area" of the antitrust violation, have standing under § 16 if those appellants are nevertheless precluded from seeking a remedy aimed at something other than restoring them or the market to a better competitive position. However, because of the posture of the case that was before us when we held that these appellants had standing to seek an equitable remedy under § 16, we were careful to note that we were not deciding what remedy, if any, they might obtain. *Id.* at 131.

The omission of the words "business or property" in § 16 certainly makes that section "far broader that § 4." *Hawaii v. Standard Oil Co.,* 9 Cir., 1970, 431 F.2d 1282, 1284, *aff'd,* 1972, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184. It does not follow that when Congress adopted § 16 it intended to permit remedies which would serve none of the purposes for which the law was passed. Plaintiffs who have not been injured in their business or property, do have standing under § 16 to seek injunctive relief designed to prevent harms which may be unrelated to competition, but only when that relief serves the antitrust function of ending an ongoing violation. *See Georgia v. Pennsylvania R. Co., supra; Bratcher v. Akron Area Board of Realtors, supra.*

This is a matter of first impression. So far as we have discovered, no court has been called upon to decide whether the antitrust laws may be used solely as a vehicle to achieve goals unrelated to the purposes for which the antitrust laws were passed. Neither the language of the statute nor the decided cases suggest that the antitrust laws may be so used. Because we find it inappropriate to seize upon a statute to bring about results of enormous impact of a sort never intended by the drafters of that law, we refuse to chart this heretofore unmarked trail. For that reason, we find that the district court was correct in declaring the remedies sought to be unavailable under § 16.

Because all of the other remedies suggested by the appellants, but not pressed upon us in briefs or argument, suffer from the same lack of antitrust connection, we hold that none of the remedies which appellants seek is available to them.[9] At oral

---

ly, it seems most unlikely that the financial gain from the alleged violation would come close to the cost of the retrofit program. Had the auto manufacturers equipped their car initially with the proper devices, the cost of doing so would presumably have been passed on to the consumer in the form of higher prices. Thus the only financial rewards reaped by the producers would have been those resulting from the increased levels of sales that the relatively lower price stimulated. Relating that gain to the retrofit program would be most

inappropriate, if not impossible. Thus, this quasi-deterrent argument is to attenuated to justify the remedy sought.

8. Certainly, dissolution and divestiture are unavailable to private parties under § 16. *See* note 5 *supra.*

9. Appellants have suggested that in addition to, or as a substitute for, retrofit, the automakers might be ordered to establish a program for testing automobile emissions and for measur-

argument, both parties agreed that the appropriateness of the remedies sought is the only issue on this appeal.[10]

Affirmed.

ing ambient air quality, to establish computerized systems for increasing traffic flow and speed, or to assist in the establishment of improved and expanded mass transportation services. Appellants note that these are just suggestions, and that they would welcome any other remedies that the district court might devise.

10.  At oral argument the following took place:

JUDGE DUNIWAY: As I understand it, you agree with Mr. Cutler [counsel for appellees] to this extent, and that is the relief that you've been talking about here in support of your appeal is not relief aimed at restoring competitive conditions.

MR. TAUSEND [counsel for appellants]: Correct.

JUDGE DUNIWAY: And the question, therefore, is can the kind of relief that you are asking for, assuming that its purpose is to get rid of consequences of the conspiracy rather than to restore competition, can that be granted under section 16.

MR. TAUSEND: That is the question.

JUDGE DUNIWAY: That is the question that I take it both counsel agree Judge Real decided, and that he decided it for the defense.

MR. TAUSEND: We could be arguing this part together.

MR. CUTLER: That is correct, Your Honor.

MR. TAUSEND: That is the issue.