The CONSERVATION COUNCIL OF WESTERN AUSTRALIA, INC., et al., Plaintiffs,

v.

ALUMINUM COMPANY OF AMERICA, (ALCOA) and Reynolds Metals Co., Defendants.

Civ. A. No. 81-293.

United States District Court, W. D. Pennsylvania.

July 9, 1981.

Victor G. Yannacone, Jr., W. Keith Kavenagh, Yannacone & Yannacone, Patchogue, N.Y., William T. Jorden, McClure, Dart, Miller, Kelleher & White, Erie, Pa., Antonio Pyle, Baskin & Sears, Pittsburgh, Pa., for plaintiffs.

Frank Seamans, John H. Morgan, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., New York City, Aluminum Co. of America.

Ralph Scalera, Thorp, Reed & Armstrong, Pittsburgh, Pa., Jeffrey Barist, Margaret Murphy, White & Case, New York City, for Reynolds Metal Co.

Mark R. Joelson, Joseph P. Griffin, Wald, Harkrader & Ross, Washington, D. C. for Government of Australia, amicus curiae.

## OPINION

COHILL, District Judge.

### Introduction

According to Greek mythology, Palladium, a Trojan statue of the goddess Pallas Athena (represented with a spear in her right hand and a distaff in her left), fell from the heavens near the tent of Ilus, a prince who was employed in building the citadel of Troy. Apollo, by an oracle, declared that the city of Troy would never fall as long as the Palladium was contained within its walls.

Plaintiff, an Australian conservation group, seeks from this court a Palladium for the Darling Range of Western Australia. Unable to obtain one in the country from which it comes, plaintiff has travelled to the United States in an unprecedented attempt to have a United States court sit in judgment on mining and refining activities taking place entirely within the foreign country from which plaintiff comes and whose allegedly deleterious effects on that foreign nation's environment plaintiff opposes. The case is now before this court on defendants' motions to dismiss.

### Facts

The Conservation Council of Western Australia, Inc. (the "Council") is a private, non-profit organization formed under the laws of the State of Western Australia in 1967 to promote the cause of environmental conservation throughout the State of Western Australia. The Council purports to represent "all those entitled to the full benefit, use and enjoyment" of the regional resources and environmental systems of the

Darling Range of Western Australia "without degradation and damage attributable to bauxite mining, alumina refining, and aluminum smelting [1] by the defendant multinational, trans-national, conglomerate corporations." These mining and refining activities are carried on entirely within the territory of Australia by affiliates of the defendants, Aluminum Company of America ("Alcoa"), a Pennsylvania corporation, and Reynolds Metals Company ("Reynolds"), a Delaware corporation, and others.

■ The Council's complaint against Alcoa stems from mining and refining activities in the Darling Range of Western Australia by Alcoa of Australia, a fifty-one percent owned subsidiary of Alcoa. Alcoa of Australia operates its refineries pursuant to duly enacted legislation of the Parliament of Western Australia. The Alumna Refinery Agreement Act, 1961–1967 [2], and its subsequent amendments authorized the construction and operation of Alcoa of Australia's alumina refineries at Kwinana and Pinjarra in Western Australia. It also granted mining rights to supply the bauxite to be refined at those refineries. The Alumina Refinery (Wagerup) Agreement and Acts Amendment Act, 1978, authorized Alcoa of Australia to construct an alumina refinery at Wagerup and granted mining rights for the bauxite to be supplied to that refinery.

Plaintiff's complaint against Reynolds also stems from mining and refining activities in Western Australia. According to plaintiff's Complaint, Reynolds [3] and three other companies have agreed to participate in a joint venture to mine bauxite and refine alumina at Worsley in the State of Western Australia (hereinafter referred to as the "Worsley Project").

The Worsley Project began with the enactment by the State of Western Australia of the Alumina Refinery (Worsley) Agreement Act, 1973 (No. 67 of 1973). This Act was amended in 1978 by the Alumina Refinery (Worsley) Agreement Act Amendment Act, 1978 (No. 10 of 1978). The Act, as amended, provides for the State's grant to four joint venturers of a mineral lease for the mining of bauxite in the Darling Range in exchange for the joint venturers' undertaking to complete the construction of an alumina refinery near Worslev.

Plaintiff's Complaint details a host of deleterious effects on the environment of Western Australia which allegedly are resulting and/or will result from defendants' mining and refining operations at Kwinana, Pinjarra, Wagerup, and Worsley. The Council seeks a declaratory judgment and injunctive relief relating to these operations: a declaration of "the rights of the people of Western Australia, not only of this generation, but of those generations not yet born," to be free from interference by the mining and refining operations conducted by Alcoa and Reynolds, and an injunction against further mining and refining "unless and until" the defendants establish by a fair preponderance of substantial credible scientific evidence that such mining and refining activities do not damage or degrade the ecological system of the area.

Defendants Reynolds and Alcoa filed Motions to Dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(1) for lack of jurisdiction over the subject matter and Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. In addition, Defendant Reynolds seeks dismissal under Fed.R.Civ.P. 12(b)(7) for failure to join indispensable parties. [4] Furthermore, both defendants assert that even if the court had jurisdiction over the case and the Complaint pleaded a cause of action, principles of international comity and the act of state doc-

---

1. Bauxite is the ore that is refined into alumina. Alumina is then smelted to produce aluminum.

2. We have taken judicial notice of the laws of Australia pursuant to Fed.R.Evid. 201.

3. As discussed in Section II, *infra*, Reynolds is not a joint venturer; a Reynolds affiliate not before this court has a forty percent interest in the Worsley Project.

4. Although Alcoa did not move to dismiss pursuant to Fed.R.Civ.P. 12(b)(7), it did assert in its Brief in Support of Dismissal that under Fed.R.Civ.P. 19, Alcoa of Australia is an indispensable party to this action. Alcoa noted that it chose not to raise this issue because it felt that there are ample other grounds on which this Court can dismiss the case with prejudice.

trine would require that jurisdiction not be exercised. The government of Australia has filed an *amicus curiae* brief. The principal thrust of the brief is to call into question the jurisdiction of a United States District Court over this controversy. Because of our disposition of defendants' motions based on lack of subject matter jurisdiction and failure to state a claim, we do not reach the other contentions raised in defendants' motions. *See e. g., Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.,* 513 F.Supp. 1100 (E.D.Pa.1981) (where court could decide case on injury and standing grounds, it expressly declined to address act of state doctrine and principles of international comity, recognizing that a decision on these issues would have significant implications for United States trade policy).

## I.

### Background

■■■ Fed.R.Civ.P. 12(b) sets forth the various grounds upon which a motion to dismiss a complaint may be made. Fed.R. Civ.P. 12(b)(1) provides that a party may move to dismiss because of lack of jurisdiction over the subject matter; Fed.R.Civ.P. 12(b)(6) allows such a motion for failure to state a claim upon which relief can be granted. Dismissal on jurisdictional grounds and for failure to state a claim are analytically distinct, each implicating different legal principles. The latter, if sustained without leave to plead further, is a disposition on the merits, *Hubicki v. ACF Industries, Inc.,* 484 F.2d 519, 523 (3d Cir. 1973); the former involves the right to be heard in court.

The Third Circuit has pointed out that motions to dismiss on the pleadings, pursuant to Fed.R.Civ.P. 12, are often confused

with each other and that the appellate court is frequently unable to determine "whether the trial court has dismissed under Rule 12(b)(1) or 12(b)(6), and even more importantly whether, if it was a 12(b)(6) proceeding, outside matters have been considered, thus converting the procedure into a Rule 56 summary judgment." [5] *Mortensen v. First Federal Savings and Loan Ass'n.,* 549 F.2d 884, 890 (3d Cir. 1977). The Court stated that the differences among these procedures are vital, especially where the claim subject to dismissal arises under the Sherman Act. *Id.* at 890. That considerable confusion has been generated with respect to Sherman Act cases stems from the fact that the same phrase, "in restraint of trade or commerce ... with foreign nations," 15 U.S.C. § 1, is both an element of the offense and a vital prerequisite for federal court jurisdiction. *Id.* at 890–91.

In view of the foregoing, we set forth here the procedural posture for our disposition of defendants' motions. In Section II, we find that this court lacks subject matter jurisdiction over this action, and accordingly dismiss the complaint pursuant to Fed.R. Civ.P. 12(b)(1). In Section III, we find, in the alternative, that even if this court had subject matter jurisdiction over this action, plaintiff fails to state a claim upon which relief can be granted and accordingly, we would dismiss the case pursuant to Fed.R. Civ.P. 12(b)(6).

## II.

### Rule 12(b)(1)

Plaintiff's Complaint alleges three bases for subject matter jurisdiction: (1) general "federal question" jurisdiction under 28 U.S.C. § 1331(a); (2) specific "federal question" jurisdiction under 28 U.S.C. § 1337;

**5.** Both defendants have submitted affidavits and exhibits in support of their motions to dismiss. Plaintiff suggests that the presence in the record of these materials converts defendants' motions to dismiss under Rule 12(b)(6) to a motion for summary judgment under Rule 56. Rule 12(b) provides that a 12(b)(6) motion shall be treated as one for summary judgment when matters outside the record are presented to, and not excluded by the court.

In reaching our decision in this case, we did not consider defendants' extra-pleading matters except in connection with a "speaking motion" pursuant to Fed.R.Civ.P. 12(b)(7). *See* Section II 4., *infra.* "The court has complete discretion to determine whether or not to accept any material beyond the pleadings." *Ware v. Associated Milk Producers, Inc.,* 614 F.2d 413, 415 (5th Cir. 1980).

and (3) the "equitable jurisdiction" of the federal courts. Because plaintiff bases its claims primarily upon alleged violations of federal antitrust laws, we turn first to the jurisdictional issue with respect to plaintiff's antitrust claims.

### 1. 28 U.S.C. § 1337

28 U.S.C. § 1337 confers jurisdiction on federal courts in actions "arising under any act of congress regulating commerce or protecting trade or commerce against restraints and monopolies." Plaintiff's Complaint purports to invoke the jurisdiction of this court pursuant to 28 U.S.C. § 1337 by asserting first, that the "statutes relevant to this proceeding" include Section 1 of the Sherman Act, 15 U.S.C. § 1[6], and second, that this suit "may involve consideration of" certain provisions of the Clayton Act that provide for money damages and injunctive remedies for violations of the federal antitrust laws.[7] The Complaint also recites several sections of the Federal Trade Commission Act, to-wit, 15 U.S.C. §§ 45(a)(1), 52, 55(a)(1), and 55(c), as well as Section 43(a) of the Lanham Trade-Mark Act, 15 U.S.C. § 1125(a). However, at oral argument, plaintiff conceded that these statutes are not applicable to this case. Accordingly, plaintiff has abandoned any attempt to rely upon them as a basis for the relief it seeks.

The challenge here is to the conduct of affiliates of two American corporations in a foreign country. The jurisdictional issue is whether that conduct, arguably legal in the foreign country in which it occurs, is answerable in the courts of the United States under the broad and potentially far-reaching language of the Sherman Act. This jurisdictional issue is two-pronged: (1) does subject matter jurisdiction exist; and (2) if so, should it be exercised? Because we conclude, for reasons discussed below, that this court lacks subject matter jurisdiction over this action, we do not address the second prong of the jurisdictional issue.

In a 1909 opinion by Justice Holmes, the Supreme Court cast doubt on the applicability of the Sherman Act to conduct outside the territory of the United States. *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909). However, there is now broad agreement that the *American Banana Co.* holding on the issue of jurisdiction is obsolete. *See Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 74 (2d Cir. 1977); *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597, 608 n. 12 (9th Cir. 1976). Post-*American Banana Co.* cases have applied the Sherman Act, and with it other antitrust laws, to extraterritorial conduct. *See, e. g., Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *United States v. Sisal Sales*

**6.** Section 1 of the Sherman Act provides in part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal. 15 U.S.C. § 1 (1976).

**7.** These statutes provide in part as follows:
Section 4 of the Clayton Act:
Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
15 U.S.C. § 15.
Section 12 of the Clayton Act:

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.
15 U.S.C. § 22.
Section 16 of the Clayton Act:
Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings ....
15 U.S.C. § 26.

*Corp.*, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927).

That American antitrust laws may cover some conduct in other nations does not mean that they extend to all such conduct. Extraterritorial application of American law is naturally a matter of concern to the other countries involved [8], and at some point, the potential international repercussions of asserting jurisdiction outweigh the impact of particular foreign conduct on United States commerce. *Timberlane Lumber Co.*, 549 F.2d at 609. However, neither the Sherman Act nor its legislative history defines this point. "Neither gives any clear indication of the scope of the extraterritorial jurisdiction conferred...." *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1291 (3d Cir. 1979). Such determination is left to the courts. *Id.* at 1291.

Accordingly, courts have formulated various tests for determining whether extraterritorial jurisdiction is proper. In *United States v. Aluminum Co. of America (Alcoa)*, 148 F.2d 416 (2d Cir. 1945), Judge Learned Hand first articulated what has become known as the "intended effects" test. Judge Hand concluded that although Congress did not intend the Sherman Act to prohibit conduct having no effect in the United States, it did intend the Act to reach conduct having consequences within this country if the conduct is intended to and actually does have an effect upon United States foreign commerce. According to the *Alcoa* rule, even wholly foreign conduct may come within the sweep of the antitrust

laws if it has a sufficient effect on interstate or foreign commerce of the United States. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. at 704–05, 82 S.Ct. at 1413.

■■ The Third Circuit has applied the "intended effects" test as the first step in a two-step process to be employed by a court in determining whether to assert extraterritorial jurisdiction pursuant to the Sherman Act. *Mannington Mills*, 595 F.2d at 1292. Under the Third Circuit approach, a court should first employ the "intended effects" test alone to decide if jurisdiction is proper. Extraterritorial jurisdiction is proper only if there is an effect on United States commerce. *Id.* at 1291–92. If such jurisdiction is proper, the court should then use a balancing test that takes into account various foreign relations impact factors [9] in order to determine whether the exercise of that jurisdiction is appropriate. *Id.* at 1294–98. *Contra Timberlane*, 549 F.2d at 611–15 (consideration of international comity factors is part of the threshold jurisdictional decision rather than a separate, subsequent matter viewed within an abstention framework).[10]

The Third Circuit has not defined what degree of effect on United States commerce is required to satisfy the "intended effects" test. Although noting in *Mannington Mills* that "[i]t can no longer be doubted that practices of an American citizen abroad having a *substantial effect* on American foreign commerce are subject to the Sherman Act," 595 F.2d at 1292 (emphasis added), the court did not explain whether sub-

---

8. In this case, for example, the Embassy of Australia filed a Diplomatic Note with the Department of State expressing its concern and requesting that the United States file a "suggestion of interest" with this court urging us not to assume jurisdiction. The Department of State, by a Note dated May 21, 1981, responded that at this preliminary stage of the proceedings, the jurisdictional question does not invoke sufficiently direct or well-defined interests of the United States Government to warrant the filing of a suggestion of interest. The State Department suggested instead that the Government of Australia submit to the court an *amicus curiae* brief.

9. These factors include the degree of conflict with foreign law or policy, the possible effect upon foreign relations if the court exercises jurisdiction and grants relief, and whether an order for relief would be acceptable in this country if made by the foreign nation under similar circumstances.

10. *Mannington Mills* was written by a divided panel. Judge Adams, joining portions of the opinion and concurring in the result, preferred the analytical framework employed by the Ninth Circuit in *Timberlane*. *See Mannington Mills*, 595 F.2d at 1301–02 n.9 (Adams, J. concurring). *But see In re Uranium Antitrust Litigation*, 617 F.2d 1248 (7th Cir. 1980).

stantiality is a minimal requirement. One court has stated that "it is probably not necessary for the effect on foreign commerce to be both substantial and direct as long as it is not *de minimus.*" *Dominicus Americana Bohio v. Gulf & Western Industries, Inc.*, 473 F.Supp. 680, 687 (S.D.N.Y. 1979).

■ Applying the first step of the *Mannington Mills* jurisdictional test to the present case, we conclude that even employing the most lenient standard of substantiality of effects, this court lacks subject matter jurisdiction over plaintiff's antitrust cause of action. Plaintiff's complaint fails to allege *any* effects on United States commerce. The only effects alleged are effects on the regional resources and environmental systems of Western Australia. *See, e. g.,* ¶¶ 103 (effect on the Northern Jarrah Forest), & 113 (effect on the regional hydrologic system of the Darling Region). These allegations regarding the defendants' activities are not sufficient to confer jurisdiction on this court.

### 2. 28 U.S.C. § 1331

■ The second asserted basis for jurisdiction is "federal question" jurisdiction under 28 U.S.C. § 1331. Federal courts are courts of limited jurisdiction. Because there is no presumption in favor of federal court jurisdiction, the basis for that jurisdiction must be shown affirmatively. *Kirkland Masonry, Inc. v. Commissioner of Internal Revenue*, 614 F.2d 532, 533 (5th Cir. 1980). "If jurisdiction is based on the existence of a federal question, the jurisdictional allegation should state that the action arises under a particular statute or provision of the Constitution and the body of the complaint must state facts showing that the case does in fact arise under federal law." *Id.* at 533. "A mere 'suggestion' of a federal question is not sufficient." *Koll v. Wayzata State Bank*, 397 F.2d 124, 127 (8th Cir. 1968). The Complaint in this case does not explain what the supposed "federal question" is. No federal statute is alleged, no

federal common law right is pleaded, and the complaint is totally devoid of any allegations of fact tending to show the existence of a federal question. Accordingly, this court does not have subject matter jurisdiction under 28 U.S.C. § 1331.

### 3. "Equitable Jurisdiction"

■ Finally, the complaint purports to invoke the "equitable jurisdiction" of this court as an independent jurisdictional basis. This basis is without merit. "Federal courts have no independent 'equity jurisdiction'; they may grant equitable relief, but not unless there is an independent statutory basis for federal jurisdiction, which is conferred only by specific congressional enactment." *In re Agent Orange Product Liability Litigation*, 506 F.Supp. 737, 740 (S.D.N. Y.1979). *See* 7 *Moore's Federal Practice*, § 65.03[2.] (2d ed. 1980).

### 4. 28 U.S.C. § 1332(a)

28 U.S.C. § 1332(a) permits federal courts to entertain suits between citizens of a state and citizens or subjects of a foreign state. Although the Council did not specifically plead diversity jurisdiction in its Complaint, it did allege facts that support such jurisdiction, to-wit, that plaintiff is an organization formed under the laws of the State of Western Australia and that both defendants are citizens of the United States.[11] There being no other basis for subject matter jurisdiction, for the reasons discussed above, we address the issue of whether this court has diversity jurisdiction.

In support of its motion to dismiss, defendant Reynolds maintains that the real dispute in this case is between plaintiff and four participants in a joint venture agreement for the construction and operation of the Worsley Project, none of whom is presently before this court. Because it appears from the face of the Complaint that this court has diversity jurisdiction, we must determine whether the joint venturers in

---

11. 28 U.S.C. § 1332(c) provides in part that "[f]or purposes of this section ..., a corpora-

tion shall be deemed a citizen of any State by which it has been incorporated."

the Worsley Project are indispensable parties.[12]

Under Fed.R.Civ.P. 19(a), we must first determine whether the joint venturers are persons who should be joined if feasible. Rule 19(a)(2)(i) provides that a person should be joined if "he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may as a practical matter impair or impede his ability to protect that interest."

The Complaint asserts that in February, 1980, Reynolds and three other companies "agreed to participate in a joint venture for the purpose of constructing and operating [the Worsley Project]." In support of its motion to dismiss, Reynolds submitted the affidavit of Deryck H. F. Stone, a Solicitor of the Supreme Court of England employed in the Law Department of Reynolds Metals Company.[13] Mr. Stone's affidavit is based upon various documents, statutes, and matters of public record, many of which have been submitted as exhibits by Reynolds. The affidavit establishes that although a joint venture agreement was made in February, 1980 for the construction and operation of the Worsley Project, Reynolds is not a participant. Rather, the joint venture consists of the following four participants: (1) Reynolds Australia Alumina, Ltd. ("Reynolds Australia"), a Delaware corporation owned by a trust of which Reynolds and a wholly owned subsidiary of Reynolds are the grantors and beneficiaries, (2) Shell Company of Australia, Limited, a company incorporated in the State of Victoria, Australia, (3) Dampier Mining Company Limited, a company incorporated in the State of Western Australia, and (4) Kobe Alumina Associates (Australia) Pty. Limited, also incorporated in the State of Western Austra-

lia. Under the terms of the joint venture agreement, the property and assets of the joint venture, consisting primarily of the facilities involved in the Worsley Project and the rights to develop them, are owned by the four joint venturers as tenants in common; Reynolds Australia owns a forty percent interest in the joint venture and the three Australian companies have, in the aggregate, a sixty percent interest. Reynolds does not have an ownership interest in the property and assets of the joint venture nor does it have any right to manage or direct the joint venturers' activities. Furthermore, the three Australian joint venturers are not affiliated with Reynolds. Although Reynolds Australia is referred to as a Reynolds affiliate, by the terms of the joint venture agreement, Reynolds Australia cannot control the Worsley Project.

The Council seeks relief directed solely toward the continuation of a project owned and operated by joint venturers. Under Rule 19(a), the presence of the three Australian joint venturers is required.[14] As noted above, the interest of each in the Worsley Project is that of a tenant in common. Whether tenants in common are indispensable depends on the nature of the relief sought and the possible effects on their interests. Where a judgment will directly affect the interests of the co-tenants because the contract involved is an entire and indivisible one, the courts have required all of the tenants to be joined. There, "the right of any one tenant is not distinct and the relief sought is interwoven with the rights of the other tenants." 3A *Moore's Federal Practice* ¶ 19.09[2], at 19–201 (2d ed. 1979). The Third Circuit applied this principle in *Brodsky v. Perth Amboy National Bank*, 259 F.2d 705, 707 (3d Cir. 1958).

---

**12.** Because we conclude that the Complaint must be dismissed for failure to join the Worsley Project joint venturers, we do not address the question of whether Alcoa of Australia is also an indispensable party.

**13.** A party may submit affidavits or other evidence for the limited purpose of a "speaking motion" in connection with Fed.R.Civ.P. 12(b)(1) and/or 12(b)(7). *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F.Supp.

831, 837 (D.C.Del.1978). *See* C. Wright & A. Miller, 5 *Federal Practice and Procedure,* § 1364, at 662–63 (1969).

**14.** Because Reynolds Australia is a Delaware corporation whose joinder as a defendant would not destroy diversity of citizenship, we direct our attention solely to the three Australian joint venturers.

In that case, a lessee sought to nullify a lease held by four tenants in common in an action in which only one of the tenants was joined. The Third Circuit held that it was "so crystal clear" that the interest of each tenant would be affected by a judgment that all of them had to be joined. The same is true of the joint venturers' interests here. Because plaintiff is demanding relief for damages allegedly caused or about to be caused solely by the Worsley Project, the joint venturers have an interest in the subject of this action and without their joinder, their ability to protect that interest may be impaired. We conclude that the joint venturers' rights cannot be adjudicated in their absence, and consequently they should be joined in this action. However, because three of the joint venturers are Australian corporations, their joinder would destroy complete diversity of citizenship, thereby divesting this court of subject matter jurisdiction. See Ed & Fred, Inc. v. Puritan Marine Insurance Underwriters Corp., 506 F.2d 757, 758 (5th Cir. 1975).

Because joinder of the joint venturers would divest this court of diversity jurisdiction, we must proceed to decide under Rule 19(b) "whether in equity and good conscience the action should proceed among the parties before [us], or should be dismissed, the absent person being thus regarded as indispensable." Rule 19(b) requires a court to consider four factors in connection with this decision: (1) to what extent a judgment rendered in the person's absence might be prejudicial to him or to those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or by other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; and (4) whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder.

The first factor to be considered deals with the need to protect absent persons from litigation adversely affecting their interests and the need to protect those who are parties from the threat of multiple actions. Because plaintiff seeks to enjoin the operation of the Worsley Project, any decision rendered would adversely affect the joint venturers' interests and thus would constitute prejudice to the absent parties.

The second factor listed in Rule 19(b) requires the court to seek an alternative to dismissing the action if to do so will minimize the prejudicial effect. *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). In this case, however, we cannot perceive of any alternative relief that will minimize the prejudicial effect to the joint venturers. The plaintiff brought this action to enjoin the operation of the Worsley Project unless and until the defendants establish by scientific evidence that the Project will not damage the Darling Range ecological system. Any available relief, therefore, will directly affect the three Australian companies. Thus, there is no satisfactory way to minimize the prejudice to the joint venturers.

As noted in the 1966 Advisory Committee Note to Rule 19, 39 F.R.D. 89, 93, the third Rule 19(b) factor meshes with other factors, particularly with the "shaping of relief" mentioned under the second factor. As we noted in connection with the second factor, there is no way we can shape relief to leave the Australian joint venturers unaffected. We reach the same result under the third factor; plaintiff seeks to enjoin the operation of the entire Worsley Project. Thus, only if all of the joint venturers in that project were present would we be able to grant the relief prayed for by the plaintiff.

The final factor listed in Rule 19(b) is "whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder." All of the joint venturers are subject to suit in Australia, and the matters at issue are local to the Australian state. We will not hear the Council, an Australian organization, complain of being sent back to the courts of its home country.

Based on the foregoing analysis, we find that the three Australian companies participating in the Worsley Project joint venture are parties who should be joined if feasible,

under Rule 19(a). Because joining those companies would destroy diversity of citizenship between all the parties, we looked to Rule 19(b) to determine whether the litigation should proceed in their absence. After analyzing the four factors set forth in Rule 19(b), we conclude that the case should not proceed in the absence of joint venturers. Therefore, although the complaint appears on its face to plead diversity jurisdiction, we would dismiss this action for failure to join an indispensable party.

## III.

### Rule 12(b)(6)

Even if we were to find that this court has subject matter jurisdiction over this action, we would dismiss plaintiff's Complaint with prejudice pursuant to Fed.R. Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. The analytical framework differs depending upon the grounds for finding jurisdiction.

### 1. 28 U.S.C. § 1331/28 U.S.C. § 1337

▆▆ As noted earlier, plaintiff's Complaint asserts violations of the antitrust laws, the Lanham Act, and various provisions of the Federal Trade Commission Act. Because plaintiff has abandoned the latter two statutes as a basis for its cause of action, we turn now to an examination of whether plaintiff's complaint states a cause of action upon which relief can be granted for violations of Section 1 of the Sherman Act.[15] In making that determination, we bear in mind that a complaint should not be dismissed for failure to state a claim unless it is abundantly clear that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

In *Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72 (3d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413, *reh. denied*, 438 U.S. 908, 98

S.Ct. 3128, 57 L.Ed.2d 1150 (1978), the Court of Appeals for the Third Circuit set forth the elements of a cause of action for violation of Section 1 of the Sherman Act. The court held that in order to sustain such a claim a plaintiff must prove:

> (1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of the conduct pursuant to that contract of conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy.

*Id.* at 81.

Notwithstanding the Conservation Council's apparent intention to rely upon Section 1 as a basis for the relief it seeks in this action, it has failed to allege *any* of the elements that must be proved to establish a violation of that section, and has failed to plead *any* facts in support of such a claim.

First, there is no allegation in the complaint that the defendants "contacted, combined or conspired" with each other. Aside from the Council's stated desire to restrain the defendants "individually and collectively, jointly and severally," the Complaint alleges no connection between Alcoa's activities in the Darling Range and the Worsley Project, in which a Reynolds affiliate has a forty percent interest. Second, the complaint is devoid of any allegations of anti-competitive effects, and does not even attempt to define a relevant product market or geographic market in which any such effects might be felt. As noted earlier, the only "effects" alleged are "effects" upon the environment and natural resources of Western Australia. Third, naturally coupled with the failure to allege any contract or conspiracy, is a failure to allege that the objects of, or conduct pursuant to, a contract or conspiracy were illegal. Finally, there is no allegation that the Council has been injured, or threatened with injury, as

---

**15.** At oral argument, plaintiff's counsel advanced for the first time a "monopolization" theory. "Monopolization" is a violation of Sec-

tion 2 of the Sherman Act, and is distinct from a Section 1 violation. Section 2 of the Sherman Act has not been pleaded.

a result, proximate or otherwise, of any contract, combination or conspiracy in restraint of trade.

The complaint asserts neither injury to competition nor injury to the ability of the plaintiff or anyone else to compete in any particular product or geographic market. The only complaint we can glean from the pleading filed is plaintiff's dissatisfaction with the alleged deleterious effects of defendants' affiliates' activities on the environment of Western Australia. Thus, the Complaint does not state a claim for relief under Section 1 of the Sherman Act.

We are mindful of the Supreme Court's admonition, upon which plaintiff places great reliance, that "summary procedures should be used sparingly in complex antitrust litigation" because "the proof is largely in the hands of the alleged conspirators...." *Poller v. CBS, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). However, as the Seventh Circuit observed in *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 553 (7th Cir. 1980),

> It does not necessarily follow ... that the above principles [enunciated in *Poller*] require the trial of cases where the cause of action alleged is substantially deficient. A contrary view would be tantamount to excepting antitrust litigation from the provisions of Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure. We rather think that the import of *Poller* and its progeny is simply that where some claim under the antitrust laws has been stated, the factual, subjective questions of intent and purpose are properly resolved only after discovery and trial. Here, however, the question presented relates, as it should on a Rule 12(b)(6) motion, to the purely legal issue of whether, viewing all of [plaintiff's] allegations ... as true, [plaintiff] has successfully pleaded a contract, combination or conspiracy in restraint of trade, within the meaning of the Sherman Act.

Addressing that purely legal issue, we find that plaintiff's Complaint fails to state a claim based upon violations of the antitrust statutes. We are unwilling to construe pleadings so liberally as to infer a "contract, combination, or conspiracy in restraint of trade" where the Complaint contains no more than the bare statement that "the statutes relevant to this proceeding [include] Title 15 United Staates [sic] Code [Section] 1."

Plaintiff's failure to state a claim based upon violations of the antitrust laws is attributable to its attempt to stretch those laws far beyond their intended purpose. The type of alleged harm that the Council seeks to redress in this action simply is not the kind of harm at which the antitrust laws are aimed.

In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), the Supreme Court held that a plaintiff attempting to recover damages under the Clayton Act "must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."

The Council is not the first plaintiff to attempt to litigate environmental issues by invocation of antitrust claims. In *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231 (9th Cir. 1976), plaintiffs alleged that the defendants, automobile manufacturers and an automobile trade association, had conspired in restraint of trade to prevent development of antipollution technology. Affirming the district court's dismissal of the suit, the Court of Appeals for the Ninth Circuit reiterated that affirmative injunctive relief has been granted under the antitrust laws to remedy consequences of anticompetitive conduct "only where the threatened harm to be prevented is harm to the system which the antitrust laws were designed to protect, the competitive market system." *Id.* at 236. The court noted that:

> [Section] 16 of the Clayton Act takes meaning from the purpose of the antitrust laws. It is not a broad license to the court to issue decrees designed to eliminate air pollution.

.        .        .        .        .

[The plaintiffs] admit that the harm to be alleviated is environmental, not economic in the antitrust sense. Based upon these admissions, we must conclude that the remedy which the [plaintiffs] seek in this case fails to serve any function of the antitrust laws.

*Id.* at 236.

Unlike the plaintiff in *In re Multidistrict Vehicle Air Pollution, supra,* the Council asserts that there is an economic harm within the penumbra of the antitrust laws which needs to be alleviated. One need only look to plaintiff's formulation of the issue in this case and the relief requested, however, to ascertain that the Council is attempting to raise environmental issues under the guise of antitrust laws. The Complaint states that "the fundamental issue in this litigation" is "whether bauxite mining, alumina refining, and aluminum smelting represents a danger of serious, permanent, and irreparable damage to the *regional resources* and *environmental systems* of the Darling [Region]." (Complaint ¶ 10) (emphasis added). The relief requested is an injunction against further mining and refining "unless and until" defendants establish by scientific evidence that such activities do not damage or degrade the ecological system of the Darling Region. This issue and the relief requested are outside the purview of the antitrust laws.

Thus, even if this court had subject matter jurisdiction under 28 U.S.C. § 1331 or 28 U.S.C. § 1337, we would dismiss plaintiff's Complaint because it fails to state a claim upon which relief can be granted.

Finally, we note that at oral argument plaintiff stressed that further proceedings are necessary in this case, and even went so far as to direct this court to a "timetable" we might employ with respect to future proceedings. Where, as here, "the allegations of the complaint fail to establish the requisite elements of the cause of action, our requiring costly and time consuming discovery and trial work would represent an abdication of our judicial responsibility." *Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d at 553. *See also Lupia v. Stella*

*D'Oro Biscuit Co., Inc.,* 586 F.2d 1163, 1166–67 (7th Cir. 1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979).

### 2. 28 U.S.C. § 1332(a) jurisdiction

We noted in Section II, *supra,* that plaintiff's Complaint appears to plead facts sufficient to invoke this court's diversity jurisdiction. Plaintiff, nonetheless, expressly avoided pleading diversity of citizenship in its Complaint, and stated at oral argument that although diversity of citizenship is present on the face of the Complaint, the Council is relying upon the antitrust laws as a basis for jurisdiction. Plaintiff may be avoiding pleading diversity for good reason. If this court were to find, contrary to our conclusion in Section II, that its diversity jurisdiction was properly invoked, we would have jurisdiction only to dismiss the Complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. We will not permit plaintiff, through the expedient of artful pleading, to circumvent the proper disposition of this action.

In a case in which a federal district court has subject matter jurisdiction because of the diversity of citizenship of the parties before it, the court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Melville v. American Home Assurance Co.,* 584 F.2d 1306, 1308 (3d Cir. 1978). Pennsylvania applies the rule of the *Restatement (Second) of Conflict of Laws* § 145 (1971), that issues in tort are governed by the local law of the state that has the most significant relationship to the occurrence and the parties. *Lewis v. Chemetron Corp.,* 448 F.Supp. 211, 212 (W.D.Pa.1978), citing *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964).

To determine the applicable law, the following factors are considered and evaluated according to their relative importance:

(a) the place where the injury occurred;

(b) the place where the conduct causing the injury occurred;

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and

(d) the place where the relationship, if any, between the parties is centered.

*Lewis v. Chemetron Corp.*, 448 F.Supp. at 212; 1 *Restatement (Second) of Conflict of Laws* § 145 (1971). In an action for injury to land, the first factor predominates; the local law of the state where the injury occurred governs unless some other state has a more significant relationship. 1 *Restatement (Second) Conflict of Laws* § 147 (1971). Applying these principles to the facts of this case, we find that we must look to the law of Australia to determine the viability of plaintiff's cause of action.

 Plaintiff has simplified this task for us by submitting an extensive affidavit of Professor Leslie Allan Stein. Professor Stein, a barrister admitted to practice in the State of Western Australia and a senior lecturer at the University of Western Australia, Nedlands, School of Law, is conversant with the law of Australia.[16] Mr. Stein states in his affidavit that under Australian law, the Council does not have standing to sue for environmental damages, nor does it have a claim for breach of fiduciary obligation. Furthermore, there is no environmental legislation in Australia that affords a private cause of action for the acts complained of. Thus, plaintiff has not stated, and cannot state, a claim under the law of Australia. Therefore, even if this court had diversity jurisdiction under 28 U.S.C. § 1332, rather than pursuant to 28 U.S.C. §§ 1331 or 1337, we would reach the same result, i. e., we would dismiss plaintiff's Complaint pursuant to Fed.R.Civ.P. 12(b)(6).

### Conclusion

A United States district court is a court of limited jurisdiction. The federal courts are sometimes accused of attempting to conjure up panaceas, then sending them down from the heavens on high to cure all the ills of society. We do not see that as our proper role or function. Unlike Zeus, who is said to have caused the Palladium to fall near Troy, this court will not place a palladium in Western Australia.

We do not have subject matter jurisdiction, and, in the alternative, the plaintiff has failed to state a claim upon which relief can be granted. Accordingly plaintiff's complaint will be dismissed with prejudice.

---

**16.** Fed.R.Civ.P. 44.1 gives district courts wide discretion in the materials to which they may resort to determine the content of foreign law. *Pancotto v. Sociedade de Safaris de Mocam-* *bique S.A.R.L.*, 422 F.Supp. 405, 408 (N.D.Ill. 1976) (court considered affidavits submitted by individual conversant with the law of Portugal).