**RELIABLE TIRE DISTRIBUTORS, INC.**

v.

**The KELLY SPRINGFIELD TIRE COMPANY and Bobby Unser and The Barnes Tire Company, Inc.**

**Civ. A. No. 74–3283.**

United States District Court, E.D. Pennsylvania.

April 1, 1985.

Richard D. Adamson and Francis P. Levine, White & Williams, Philadelphia, Pa., for plaintiff.

Spear, Wilderman, Sigmond, Borish, Endy & Silverstein, Philadelphia, Pa., for Bobby Unser.

Duane, Morris & Heckscher, Philadelphia, Pa., for Kelly Springfield.

### FINDINGS OF FACT and CONCLUSIONS OF LAW ON DAMAGES

SHAPIRO, District Judge.

This action arises out of an agreement, dated April 20, 1972, between plaintiff Reliable Tire Distributors, Inc. ("Reliable"), a corporation engaged in wholesale tire distribution, and Sports Headliners ("Headliners"), agent of defendant Bobby Unser ("Unser"), internationally-known race car driver, and a second agreement, dated May 23, 1972, between Reliable and defendant Kelly Springfield Tire Company ("Kelly"), a manufacturer and distributor of tires. The court held separate trials on liability and damages. On March 9, 1984, 592 F.Supp. 127, this court's Findings of Fact and Conclusions of Law determined the following:

The earlier Reliable-Headliners agreement provided for the registration of the "Bobby Unser" trademark and granted plaintiff[1] an exclusive license to make or have made tires bearing this trademark and thereafter to use or sell them. Reliable agreed to pay royalties to Unser for each tire sold and Unser agreed to use his best efforts to promote and sell the tires. Defendants Unser and Kelly ratified the provisions of the agreement regarding their respective duties.

The later agreement, between plaintiff, using its registered trade name "Speedway Products," and defendant Kelly provided that Kelly would manufacture and supply Reliable with "Bobby Unser" tires and specified certain terms and conditions for delivery, payment, warranties, etc. Kelly was to supply the tire molds used in the

**1.** Vista Rubber Corporation ("Vista"), a New Jersey corporation formed by Reliable specifically for purposes of this agreement, was the original party to the Unser contract. Subsequent to the execution of the agreement, Vista assigned all of its rights, title and interest in the agreement to Reliable and Vista was dissolved.

manufacture of the tires to be paid for by Reliable over a three-year period. The original term of the agreement extended only to December 31, 1972 but the agreement was renewable from year-to-year if no action to terminate was taken by either party. Each party had the right to terminate by three months' notice prior to the end of the calendar year. Together the two contracts constituted the "Bobby Unser" program; Reliable had the exclusive right to use Unser's name to market tires manufactured by Kelly in accordance with Reliable's requirements.

But instead of producing tires to fill orders obtained by Reliable, in accordance with the Kelly-Reliable agreement, Kelly manufactured quantities of "Bobby Unser" tires in varied sizes and held them in inventory for future sale to Reliable. As a result, by 1974 Kelly had acquired a substantial excess inventory of "Bobby Unser" tires, particularly in uncommon or less popular sizes. In February, 1974, Kelly requested Reliable's permission to dispose of the surplus "Bobby Unser" tires. By letter dated February 6, 1974, Samuel Vill, Reliable's General Sales Manager, authorized Kelly to dispose of the surplus "Bobby Unser" tires subject to certain restrictions: the parties had to agree mutually which tires were excess; Kelly had to maintain an adequate inventory for estimated future sales and remove the "Bobby Unser" name from the excess tires or pay a fifteen-cent (15¢) per tire royalty; Kelly could sell the tires only in Japan, Kansas City or the West Coast of the United States, excluding San Francisco. Kelly declined to dispose of the excess tires in inventory on those terms. Reliable subsequently signed a letter, dated June 28, 1974, authorizing Kelly to dispose of the excess tires "without strings."

In September, 1974, Kelly contacted Reliable and offered to sell the excess inventory tires to Reliable at a discounted price if Reliable would accept the entire inventory immediately and make payment in full within thirty (30) days of shipment. But Kelly would not drop ship these tires as it did for the Bobby Unser tires Reliable ordered under its contract with Kelly. Reliable rejected that offer. Kelly then offered to sell the tires to defendant Barnes Tire Company ("Barnes") for the same price and on the same terms and conditions offered to Reliable. Barnes also rejected the offer but made a counter-offer accepted by Kelly. Without first reoffering the tires to Reliable, Kelly agreed to sell the excess tires to Barnes at a price lower than the Kelly-Reliable contract price and lower than the discounted price originally offered to Reliable. Kelly also agreed to drop ship the tires for Barnes and did not require immediate full payment.

Kelly also agreed to and did manufacture additional "Bobby Unser" tires for sale to Barnes in November and early December, 1974, at the same discounted price and on the same favorable terms as the excess tires. Kelly was then manufacturing and selling tires to Reliable for prices set under the 1972 contract (which permitted Kelly to set the price each half year). Therefore, during November and early December, 1974, Kelly manufactured and sold tires to Reliable and Barnes at different prices and on different terms.

In December, 1974, Reliable sought to purchase 30,000 tires at the Barnes price but Kelly refused to sell them to Reliable at that price. Reliable then contacted other tire manufacturers to determine whether it could have "Bobby Unser" tires produced at lower cost elsewhere. Mohawk Rubber Company ("Mohawk") agreed to manufacture the tires for a lower price than that charged by Kelly; in the Spring of 1975 Reliable requested Kelly to release the tire molds for transfer to Mohawk. The Kelly-Reliable agreement stated that, "[n]o mold will be removed from [Kelly's] plant as long as any balance remains unpaid on such mold." ¶ 17(d). Kelly refused to release the molds because Reliable owed Kelly $46,000 for the molds and Reliable declined to pay the remaining amount in advance of the due date.

The Reliable-Headliners agreement provided that Unser could terminate that con-

tract if he did not receive at least $7,500 in royalties in any contract year. On April 23, 1975, Unser, claiming he had not received the minimum amount by the last day of the third year, April 21, 1975, sent a notice to Reliable that their agreement was terminated. Reliable received the notice on April 25, 1975. On April 28, 1975, Unser received a check from Reliable in payment of royalties due for the past contract year. Reliable claimed the check was mailed on April 19, 1975, and denied Unser's right to terminate the agreement. Upon notification of Unser's assertion that the Reliable-Headliners agreement was terminated, Kelly notified Reliable that consequently the Kelly-Reliable contract was terminated on May 25, 1975.

Reliable's complaint against defendants alleged that: Kelly and Barnes violated the Robinson-Patman Act, 15 U.S.C. § 13, by Kelly's manufacture and sale of the "Bobby Unser" tires to Barnes at lower prices than it would sell to Reliable; Kelly, Barnes and Unser conspired to restrain trade and eliminate Reliable as a distributor of tires in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; Barnes and Kelly infringed Reliable's registered "Bobby Unser" trademark; Kelly breached its contract with Reliable by manufacturing and selling tires to Barnes, refusing to manufacture tires for Reliable, and terminating the agreement; and Barnes tortiously interfered with Reliable's contract with Kelly by inducing the sale of "Bobby Unser" tires that were not in inventory but were specially manufactured for Barnes.

On liability, the court found that Kelly breached its agreement with Reliable by: 1) specially manufacturing additional Bobby Unser tires over and above the excess inventory and selling them to or for Barnes in November and December, 1974; and 2) unilaterally terminating its agreement with Reliable in May, 1975. The court also found that Barnes tortiously interfered with the Reliable-Kelly contract by inducing Kelly to manufacture additional Bobby Unser tires for Barnes'. customers. The court found in favor of all defendants on all other claims. This opinion constitutes the court's findings of fact and conclusions of law on damages.

## I. DAMAGES AGAINST KELLY

The court has determined that Reliable is entitled to damages from Kelly for breach of contract as a result of its sale of specially manufactured tires and its unilateral termination of the Kelly-Reliable agreement. In determining the law to be applied in measuring the damages for breach of contract, a federal district court is required to apply the choice of law doctrine of the state in which it is sitting. *Klaxon v. Stentor Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under the law of Pennsylvania, issues in contract actions are governed by the law of the place with the most significant relationship to the parties and the transaction. *See, e.g., Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205 (3d Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). Because the contract at issue was negotiated in New Jersey, the tires were manufactured in New Jersey and the parties agreed that the contract should be governed by New Jersey law, Reliable's claim against Kelly for breach of contract is governed by New Jersey law.

Under New Jersey law, when a party has breached a contract, the non-breaching party has a right to recover the lost profits it reasonably expected to earn under the contract. *See, e.g., Bak-A-Lum Corp. v. Alcoa Building Products*, 69 N.J. 123, 351 A.2d 349 (1976). The non-breaching party has the burden of proving the amount of damages it sustained. Moreover, it must establish that the damages are the direct and proximate result of the breach. *Sandler v. Lawn-A-Mat Chem. & Equip. Corp.*, 141 N.J.Super. 437, 454, 358 A.2d 805, 814 (App.Div.1976). Lost profits for breach of contract must be related to the consequences of the breach. *Donovan v. Bachstadt*, 91 N.J. 434, 453 A.2d 160 (1982). Lost profits are recoverable as damages only when they might have been realized and are capable of being estimated

with a reasonable degree of accuracy. *Van Dusen Aircraft Supplies v. Terminal Const. Corp.*, 3 N.J. 321, 70 A.2d 65 (1949). In order to prove lost profits, plaintiff must provide the finder of fact with a reasonably fair basis for calculating the loss sustained as a result of the breach. *Rempfer v. Deerfield Packing Corp.*, 4 N.J. 135, 72 A.2d 204 (1950).

## II. WRONGFUL TERMINATION

To determine the amount of damages Kelly's wrongful termination in May, 1975 caused Reliable, two factors must be considered: first, the length of time the contract would have continued but for Kelly's wrongful termination; and second, the amount of profits lost during that time as a result of Kelly's wrongful termination.

The agreement entered into between Reliable and Kelly on May 23, 1972 was a requirements contract; Kelly agreed to manufacture all Unser tires ordered by Reliable. The contract was renewable year-to-year until April, 1980 but either party had an option to cancel the agreement by giving written notice ninety (90) days prior to the end of each calendar year.

> This agreement will be effective as of June 1, 1972. It shall be renewed without further action for additional successive periods of one calendar year each, provided, however, that either party may terminate this agreement, or any renewal thereof, at the end of any calendar year upon three (3) months' prior written notice given and effective upon mailing by registered mail.

Agreement, Paragraph 2.

■ Reliable contends that it is entitled to damages sustained from May 25, 1975 to April 20, 1980. But in May, 1975, Kelly clearly expressed its intent to terminate its contract with Reliable. Although the court has found that the Kelly termination letter was not immediately effective, the Kelly letter of May 25, 1975 did provide written notice of termination. Under the terms of the contract, termination was effective "at the end of any calendar year upon three (3) months' prior written notice given." The letter of May 25, 1975 was a written notice mailed more than ninety (90) days prior to December 31, 1975 and it effectuated termination as of that date.

Reliable has argued that Kelly could not exercise its right to terminate so long as Reliable was fulfilling its obligations under the contract because an implied covenant of good faith and fair dealing is applied to the termination of contracts under New Jersey law. *Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598 (1973), held that Shell Oil Co.'s termination of a service station franchise breached the contract even though there was a ten-day termination clause; the Court found the bargaining power of the parties grossly disproportionate and the termination provision unfair. Here, Reliable and Kelly were dealing at arms length. Reliable was one of the largest tire wholesalers in the country. The contract's requirement of ninety (90) days' notice permitted Reliable to obtain another supplier; Reliable could obtain the molds for manufacturing Unser tires on termination of the Kelly-Reliable contract by paying Kelly the balance due. There was nothing unfair or overreaching in this termination clause. Therefore, this case differs from *Shell* and there was no legal impediment to Kelly's termination of the contract in accordance with its terms.

■ Even if the letter improperly terminating the contract in May were not an effective notice of termination on December 31, 1975, and even if Unser had not cancelled his contract with Reliable, it cannot be doubted that Kelly would have mailed timely notice of termination in December, 1975 in any event. The number of tires sold under the Unser program was never what had been expected. Reliable was not prompt in meeting its obligations under the Kelly contract. Kelly's attempt to manufacture the tires economically in large runs resulted in substantial surplus inventory. Kelly threatened to terminate the program at the end of 1974 if Reliable did not sign the "without strings" letter authorizing sale of the excess Unser tire inventory.

Reliable's limited requirements for Unser tires would have continued to make the Unser program an unprofitable one for Kelly. On the evidence as a whole, the court finds this would have been the case notwithstanding Unser's victory at the Indianapolis 500 in May, 1975. For a number of reasons the testimony was convincing that Unser's fame as a racer did not do much to promote the sale of tires bearing his name; even after Unser attempted to terminate his contract with Reliable, there is no evidence he was able to profit in any way from anyone's use of the Unser name in connection with the sale of tires. Therefore, it would have been reasonable and equitable for Kelly to have terminated the Reliable contract at the end of 1974 or 1975 and not a violation of any covenant of good faith or against public policy. Plaintiff has not established by a preponderance of the evidence that Kelly would not have terminated the contract in December, 1975. Therefore, the court finds that the relevant period for measuring damages ends on December 31, 1975, when the contract would have otherwise terminated.

Having determined that Reliable is entitled to lost profits only through December 31, 1975, the remaining issue is the amount of the lost profits for that period of time. To calculate lost profits, the court must project both the number of tires Reliable would have purchased from Kelly during that time period and the amount per tire it would have earned.

 Reliable claims it would have sold 30,000 tires in 1975; Reliable's expert David Carpenter gave an opinion on lost profits based on that assumption. Carpenter projected that sales in 1975 would have increased as a result of Reliable's developing distribution network and the trade value from Bobby Unser's increased prestige following his winning first place in the Indianapolis 500 race in May, 1975.

Reliable also contends that if Kelly had provided Reliable with the three months' written notice required by the contract, Reliable would have ordered sufficient Unser tires during that three-month period to supply its distributors for one year beyond the termination date (which the court finds to be December, 1975). But that is inconsistent with the prior conduct of the parties. The contract required drop shipment and Reliable had in the past purchased only when orders were placed. When originally offered the excess inventory tires at a discounted price but without drop shipment by Kelly, Reliable had refused to stock Unser tires. Although Reliable attempted to purchase 30,000 Unser tires from Kelly in December, 1974, it ordered them at the Barnes price and refused to purchase them at the contract price.[2] When Reliable found that Mohawk would manufacture Bobby Unser tires at lower cost, it would not or could not pay Kelly over $46,000 owed Kelly for the molds in advance of the due date.[3]

Therefore, it is more likely than not that Reliable would not have purchased any tires from Kelly in the year 1975 even if Kelly had cancelled the contract in May, 1975 and provided three months' written notice of cancellation. Eugene Chambers, the Sales Administrator for Reliable, testified that he felt Reliable could no longer use the Bobby Unser name after it received Unser's notice of termination on April 23, 1975. But even prior to that time Reliable purchased only 200 Unser tires from Kelly; it had virtually discontinued the Unser program before it was terminated by Kelly. Samuel Vill, Reliable's General Sales Manager, told Kelly that it should manufacture tires only on specific order and Kelly should carry no inventory.

Vill and Chambers testified that Kelly's sale of tires to Barnes had destroyed the Bobby Unser program. Although they did not distinguish sale of excess inventory from sale of specially manufactured tires, Reliable officials responsible for the Unser

---

**2.** Reliable argued that the lower price was necessitated by Kelly's having sold tires to Barnes at discount or distress prices.

**3.** Kelly refused to release them only for that reason.

program believed that all of the activity of Barnes made it impossible for Reliable to sell Unser tires unless it obtained them at Barnes' price. Since the Unser program was effectively ended before Kelly terminated its contract with Reliable in May, Reliable has not proved any lost profits from lost sales of Unser tires caused by Kelly's termination of the Reliable-Kelly contract in May, 1975.

Because Reliable has failed to establish that the Kelly-Reliable agreement would have continued beyond December, 1975, it is unnecessary to consider the profit projections through 1980 in detail but the proof of profits for that period was unconvincing and speculative. Carpenter projected Reliable's lost profits from the sale of Unser tires from January 1, 1977 through April 20, 1980, by using Reliable's profits from sales of another high performance line of tires, Spartan-Vanguard, as a model. He assumed that sales of the Unser line would have been at least as large as those of the Spartan-Vanguard line. Such an assumption was inappropriate since the Spartan-Vanguard tire differed from the Bobby Unser tire in several respects. The Spartan-Vanguard tire was not a "signature" tire; the line included truck and radial high performance tires not included in the Bobby Unser line. The court cannot conclude that sales of Spartan-Vanguard tires were of probative value in estimating sales of Bobby Unser tires.

Moreover, although Carpenter conceded that the tire industry was highly competitive, he assumed that Reliable could have commanded a price for the Unser tire that was 125% of that obtained for Reliable's Spartan-Vanguard tire. This assumption failed to account for the effect of increased competition if there were so substantial a premium. Neither did Reliable's projection deal with the changes in the relevant market over the time for which damages were

claimed. The testimony established that the Unser tire was a nylon bias tire, the popularity of which was decreasing in favor of the newer radial tire. Reliable's projections assumed that Reliable would have continued to sell increasing amounts of the Unser nylon bias tire at a premium of 25% over the regular market price despite the changes in the marketplace.

Future lost profits projected from Reliable's actual past experience with the Bobby Unser tires with adjustments to reflect increased sales and decreased costs of sales would have been more probative than a projection of lost profits based on a completely different line of tires. The financial statements presented on the actual operation of Reliable's Unser program showed that it had operated at a loss.[4] But Reliable claimed it was on the verge of profitable operation. Reliable argued that increased sales would have resulted from a more developed distribution network and Bobby Unser's increased prestige after winning first place in the 1975 Indianapolis 500 race and that decreased costs were likely because certain fixed costs for molds, fees and advertising already expended were non-recurring. But whatever the adjustment to Unser figures made to calculate damages, it was the Unser figures that would have provided a credible base; the court finds the use of Spartan-Vanguard figures speculative and unconvincing.

■ In addition to claiming the profits lost because of Kelly's wrongful termination of the contract, Reliable claims the unrealized value of capitalized expenditures for Unser's endorsement fee, advertising and tire molds. Reliable alleges it incurred these extraordinary, long-term expenses with the expectation that Kelly would honor its contractual obligations until April, 1980, so that an award of "reliance damages" is required to place it in the position

---

**4.** Bobby Unser, who had already won many races, including an Indianapolis 500, might not have been very popular or very cooperative in promoting the tires; Reliable might not have advertised them enough or developed a proper distribution network, or signature tires might not have been popular in the marketplace. The restrictive effect of the oil embargo on automobile travel and resultant loss of sales of automotive products might have been significant factors as well.

it would have been had the contract not been breached. Reliable contends that to deny the unrealized portion of these expenses would in effect penalize it for adhering to its contractual obligations.

Reliable has failed to prove that it incurred these expenses with the reasonable expectation that the contract would continue until April 20, 1980. The Kelly-Reliable agreement was a year-to-year contract terminable at the end of any calendar year on three months' written notice. Because either party could terminate at the end of any calendar year, Reliable assumed the risk that some of its long-term, non-recurring costs might not be fully realized.

Reliable is entitled to recover expenditures made in anticipation of the contract's continuing until the end of calendar year 1975, because Kelly was obligated to it under the contract until then. But Reliable has not proved that portion of the capitalized costs, if any, expended in 1975 in the expectation that the Kelly-Reliable agreement would last until December 31, 1975. Because Reliable has failed to meet its burden of proof, no award may be made for "reliance damages" or lost profits.

### III. SPECIALLY MANUFACTURED TIRES

#### A. *Kelly's Breach of Contract*

■ Reliable's "without strings" letter permitted Kelly to dispose of certain excess inventory tires without restriction but the manufacture and sale of additional tires for Barnes was unauthorized and in breach of the Reliable-Kelly contract. Therefore, Reliable is entitled to damages caused it by Kelly's sale of Unser tires specially manufactured for Barnes.

■ Reliable contends that it is entitled to "restitution" for Kelly's "unjust enrichment" from the sale of these tires specifically manufactured for Barnes. A party is entitled to restitution to the extent that he has conferred a benefit on the other party by way of part performance or reliance. *See Restatement (Second) of Contracts* § 370 (1981). Reliable claims that it is

entitled to an accounting for the profits Kelly received as a result of the sale of tires to Barnes because Kelly obtained its profit through the improper use of contractual benefits conferred by Reliable such as use of Reliable's tire molds and the Unser trade name. Reliable argues that if Kelly had not wrongfully used the Reliable tire molds and the Unser name, Kelly could neither have manufactured nor sold any specially manufactured tires and could not have earned any profit.

■ However, a party is only entitled to the protection of his restitution interest as an alternative to enforcement of the contract. *See Restatement (Second) of Contracts* § 373 Comment a (1981). In this case, Reliable has sought enforcement of the Kelly-Reliable agreement by an award of damages and is entitled to the protection of its expectation interest rather than its restitution interest. Moreover, the remedy sought by Reliable, an accounting for profits, is

> an essentially equitable remedy, the right to which arises generally from the defendant's possession of money or property which because of some particular relationship between himself and the plaintiff, the defendant is obliged to surrender.... [A]n accounting has not served as a substitute for legal damages.

*American Air Filter Co., Inc. v. MacNichol*, 527 F.2d 1297, 1300 (3d Cir.1975). In this case, because an adequate legal remedy exists, the equitable remedy of an accounting is inappropriate.

The correct measure of damages Reliable must prove to protect its expectation interest is the profit it would have realized from the Unser program were it not for the sale of the specially manufactured tires to Barnes. It would need to show the number of tires sales Reliable lost as result of Kelly's sale of these tires to Barnes at discounted prices. However, it was not the sale of specially manufactured tires alone that destroyed the Bobby Unser program; it was the combination of sale of excess inventory and specially manufactured tires to Barnes at prices below the contract price

that hampered Reliable sales. But only the sale of specially manufactured tires was a breach of contract. Therefore, it was Reliable's burden to separate the profits lost by Reliable as a result of the improper sale of specially manufactured tires from profits lost from the permissible sale of excess inventory tires. Reliable did not do so.

 However, Reliable's failure to establish adequately the profit it lost as a result of the sale of the specially manufactured tires does not prevent it from recovering any damages. The fact that damages cannot be ascertained with mathematical precision does not preclude recovery. *See Donovan v. Bachstadt*, 91 N.J. 434, 453 A.2d 160 (1982). "Mere difficulty or lack of certainty in the proof or finding of the quantum of damages does not inhibit an award to the successful party." *Sandler v. Lawn-A-Mat Chem. & Equip. Corp.*, 141 N.J.Super. 437, 454, 358 A.2d 805, 814 (App.Div.1976). Reliable's claim that it was damaged by sale of the Unser tires specially manufactured to sell to Barnes is uncertain not as to the *fact* of damage but only as to the *amount*. Where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right to any recovery. *See Oliver v. Autographic Register Co.*, 126 N.J.Eq. 18, 25, 7 A.2d 797 (Ch.1939).

 A reasonable measure of damages for Kelly's breach is the profit Reliable would have made had Kelly specially manufactured tires for Reliable to sell instead of Barnes. Reliable's expert, David Carpenter, using Kelly inventory lists, determined that Kelly actually sold 13,791 specially manufactured tires to Barnes. In projecting profits lost by Reliable because Kelly wrongfully terminated the Reliable contract, Carpenter calculated that in 1975, Reliable would have made a profit of approximately $2.08 per tire. These calculations of Carpenter's are a reasonably fair basis for determining that the profit Reliable would have made had it sold these specially manufactured tires instead of Barnes was $28,685.28.

## B. *Barnes' Tortious Interference*

 Barnes tortiously interfered with the Reliable-Kelly contract by causing Kelly to manufacture additional Unser tires for Barnes. Under Pennsylvania conflicts law, in tort cases, the court considers the place where the conduct causing injury and the injury occurred as well as where the relationship between the parties is centered to determine the jurisdiction with the most significant relationship to the cause of action. *See, e.g., Conservation Council of Western Australia, Inc. v. Aluminum Company of America*, 518 F.Supp. 270 (W.D.Pa.1981); *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964). The specially manufactured tires purchased by Barnes were manufactured and distributed in New Jersey and the Kelly-Reliable contract with which Barnes interfered was governed by New Jersey law; therefore, Reliable's claim against Barnes for tortious interference is governed by New Jersey law.

 Under New Jersey law, unjustifiable interference with contractual rights or business relations is an actionable tort. *Middlesex Concrete Products & Excavating Corp. v. Carteret Indus. Assoc.*, 37 N.J. 507, 181 A.2d 774 (1962). The party whose contract has been tortiously breached is entitled to recover the damages that are the direct and proximate result of the tortious interference. So the appropriate measure of damages here is Reliable's loss from the sale to Barnes of tires in addition to the excess inventory or, in the absence of proof of this, the profits Reliable would have made if Kelly had sold these specially manufactured tires to Reliable instead of Barnes. Reliable did not establish any loss of profit from Barnes' sale of specially manufactured tires in breach of the contract distinct from its loss of profit from Barnes' sale of the excess inventory tires which was not actionable. But Reliable did prove it would have earned a profit of approximately $2.08 on each of the 13,791 specially manufactured tires, a total of $28,685.28.

A recovery against an entity breaching a contract does not prevent recovery against the entity inducing or causing the breach nor does it reduce the damages recoverable. Both are wrongdoers and each is liable for the loss in its entirety; *see Restatement (Second) of Torts* § 774 A, Comment e (1981). Thus, Reliable's recovery against Kelly for breach of contract does not preclude its recovery against Barnes for tortious interference nor does it reduce the amount of the judgment in its favor. However, because the compensatory damages arising from Kelly's breach of contract are identical to those arising from Barnes' tortious interference, any payment made to Reliable by Kelly reduces the amount due from Barnes just as payment made by Barnes inures to the benefit of Kelly in order to avoid the duplication of damages.

## IV. PUNITIVE DAMAGES

Reliable seeks punitive damages against Kelly, Barnes and Unser. Punitive damages are awarded to deter outrageous and malicious conduct and to deter a wrongdoer.

> Punitive or exemplary damages are sums awarded apart from compensatory damages and are assessed when the wrongdoer's conduct is especially egregious; they are awarded on a theory of punishment to the offender for aggravated misconduct and to deter such conduct in the future.

*Leimgruber v. Claridge Associates, Ltd.,* 73 N.J. 450, 454, 375 A.2d 652, 654 (1977). In order to award punitive damages there must have been acts done with bad motive or with reckless indifference to the interest of another. *See Nappe v. Anschelewitz,* 97 N.J. 37, 49, 477 A.2d 1224, 1230 (1984).

The liability of Kelly is for breach of contract in terminating the contract unjustifiably in May, 1975 and in specially manufacturing additional tires to sell to Barnes in December, 1974. Punitive damages may be recovered for an intentional breach of contract in appropriate circumstances; however, the standard for awarding such damages is high. A plaintiff must show wilful, intentional and malicious conduct on the part of defendant. *See Sandler v. Lawn-A-Mat Chem. & Equip. Corp.,* 141 N.J.Super. 437, 358 A.2d 805 (App.Div.1976). In *W.A. Wright, Inc. v. KDI Sylvan Pools,* 569 F.Supp. 589 (D.N.J.1983), the only reported opinion in New Jersey that has awarded punitive damages in a breach of contract action, the court refused to set aside a jury award of punitive damages for breach of contract entered into by the defendant with the knowledge that its action violated a court order entered with its consent in settlement of prior litigation.

Kelly's termination of the Reliable contract in May, 1975 was not sufficiently egregious to permit an award of punitive damages. The Bobby Unser program consisted of two contracts—the Reliable-Headliners contract gave Reliable the exclusive right to use the Unser name to market tires and the Kelly-Reliable contract required Kelly to manufacture Unser tires to meet Reliable requirements. The Kelly-Reliable contract permitted Kelly to terminate if the underlying Reliable-Headliners contract were terminated for any reason.

The Reliable-Headliners contract provided that Bobby Unser could terminate it if minimum royalties were not received each year. In April, 1975, Unser, improperly claiming he had not received the minimum amount that year, sent an effective notice of termination. Following Unser's assertion that the Reliable-Headliners contract was no longer in effect, Kelly used Unser's purported termination as the reason for its termination of the Reliable-Kelly contract in May, 1975. But Kelly knew or should have known that the number of Unser tires sold entitled Unser to more than the minimum amount of royalties necessary to keep the Headliners contract in full force and effect, even if it did not know the amount actually paid by Reliable to Unser when Unser purported to terminate. However, the fact that Kelly seized upon the Unser notice to further its own economic interest in terminating the Reliable-Kelly contract

is insufficient to constitute the actual malice or wilful, intentional conduct requisite to an award· of punitive damages. *Buono Sales, Inc. v. Chrysler Motors Corp.*, 449 F.2d 715 (3d Cir.1971).

Kelly's conduct in manufacturing tires for Barnes in addition to disposing of its excess inventory, although more egregious, does not warrant an award of punitive damages. Kelly's contract with Reliable was to manufacture Unser tires to meet Reliable requirements. Instead, in order to achieve economies of scale, it manufactured each size tire required by Reliable in large runs in excess of Reliable's sales. When Reliable's sales failed to meet expectations, Kelly developed a large excess inventory of Unser tires. Reliable's Samuel Vill, faced with the threat of Kelly's termination of their contract in September, 1974, reluctantly agreed in June, 1974 to the sale of those excess inventory tires in the less popular sizes "without strings." But no reasonable person could interpret this letter as an authorization to use the Reliable-Unser molds to manufacture Unser tires for others in violation of Reliable's exclusive license to the use of the "Bobby Unser" trademark on tires.

Kelly originally offered to sell the excess inventory to Reliable but on less favorable terms than ultimately offered to Barnes; the excess tires were never reoffered to Reliable on those terms. Neither was Reliable's permission sought or obtained for the manufacture of additional tires to sell to Barnes. Kelly was a signatory to the Reliable-Headliners contract Barnes had negotiated for Unser; there was no question it knew Reliable's rights were exclusive. There is also no question it knew of the devastating effect on Reliable of the sale of popular sized Unser tires to Barnes at prices significantly lower than Reliable's (the discount was 27%–67%; they had been offered to Reliable only at a 20% discount).

Even though Kelly recklessly disregarded the effect its manufacture of additional tires for Barnes would have on Reliable's Unser program, an award of punitive damages is not warranted. Where a cause of action is limited to breach of a commercial contract, punitive damages are not appropriate regardless of the nature of the conduct constituting the breach, absent special circumstances dictated by the nature of the relationship between the parties, such as the existence of a fiduciary relationship. *Sandler v. Lawn-A-Mat Chem. & Equip. Corp.*, 141 N.J.Super. at 449, 358 A.2d at 812. No special relationship of trust existed between Kelly and Reliable. They were parties contracting at arms length with mutual rights and obligations arising under the contract. On the record as a whole, Reliable may not recover punitive damages against Kelly for Kelly's conduct in breaching the contract.

The liability of Barnes is for tortious interference with the Kelly-Reliable contract. In order to recover punitive damages in a tort action, plaintiff has the burden of showing intentional wrongdoing or reckless disregard of the rights of another by the tortfeasor. *See, e.g., LaBruno v. Lawrence*, 64 N.J.Super. 570, 166 A.2d 822, (App.Div.1960), *certif. denied*, 34 N.J. 323, 168 A.2d 694 (1961). Barnes was involved in the execution of the original Reliable-Headliners agreement as an employee of Headliners, the agent of Bobby Unser. Unser was later a minority shareholder in the Barnes Tire Company and Barnes represented Unser informally in other matters. There is no question that Barnes knew Reliable had the exclusive right to manufacture Bobby Unser tires; in conditioning its counter-offer to purchase Kelly's excess inventory on the manufacture of additional Unser tires in the more popular sizes, it was inducing Kelly's breach of the Reliable contract and the Headliners contract Barnes itself negotiated. Because Barnes had earlier informed Reliable it would lose the Unser program and because it must have known its obtaining additional Unser tires manufactured by Kelly on Reliable molds in addition to the excess inventory violated Reliable's exclusive rights, punitive damages are appropriate and awarded in the amount of $15,-000.00.

Punitive damages may not be awarded against Unser because punitive damages are not recoverable absent an independent claim for actual or compensatory damages. The right to punitive damages is "a mere incident to a cause of action ... and not the subject of an action itself." *Baram v. Farugia,* 606 F.2d 42, 46 (3d Cir.1979). *See also O'Connor v. Harms,* 111 N.J.Super. 22, 29–30, 266 A.2d 605, 608 (App.Div.1970); *Barber v. Hohl,* 40 N.J.Super. 526, 534, 123 A.2d 785, 789 (App.Div.1956).

Reliable has asserted no claim against Unser for actual or compensatory damages for breach of contract, so it cannot recover on an independent claim for punitive damages arising from Unser's unlawful termination of the agreement and it is unnecessary to deal with Unser's claim that his reliance on the advice of counsel and desire to further his own economic interests negated the showing of actual malice or deliberate motive to injure Reliable necessary for award of punitive damages.

## V. REINSTATEMENT OF THE BOBBY UNSER PROGRAM

The equitable relief of reinstatement is theoretically appropriate if a damage award is inadequate to compensate the plaintiff. Here compensatory damages for breach of contract were available to plaintiff if proved but compensatory damage for breach of contract was claimed against Kelly only.

Reliable now seeks to have the contracts between Headliners (Unser)-Reliable and Kelly reinstated. In effect, plaintiff seeks a declaratory judgment that because it was not in default on the Headliners (Unser) contract and there was no just cause for terminating the Kelly contract, these two contracts constituting the Unser program remain in full force and effect. But although the court did find there was no Reliable default justifying Unser's termination and Kelly's termination for that reason was unjustified, the contracts would have long since expired by their terms and to declare them in effect for the years remaining on their terms at the time of the breach would be impracticable if not impossible.

Unser attempted to terminate the Headliners-Reliable contract on April 23, 1975; while there was no good cause then, the reduced volume of sales and consequent reduced amount of royalties would have probably permitted Unser to terminate the contract in 1976. Even assuming that absent Barnes' interference with the Kelly-Reliable contract there would have been sufficient sales and royalties to keep the Headliners contract in effect after 1976, the contract expired by its terms in 1977; even if Reliable exercised its option to renew, the Headliners contract would have expired in 1980. The Kelly-Reliable contract was subject to termination at the end of each calendar year without notice so that it would have been terminated by December, 1975.

The relationship of the parties was strained while these contracts were in effect. Reliable did not think Unser did enough to promote the tires; Unser thought the Reliable people had misrepresented the number of tires that would be sold. Kelly thought Reliable purchased too few Unser tires and sometimes took too long to pay for them. Reliable resented Kelly's manufacturing more tires than it ordered or needed so that an excess inventory was created, especially in unpopular sized tires. So even without this litigation, it would be difficult to reinstate the Bobby Unser program among the present principals. But in view of this lawsuit, instituted at the end of 1974, it is clear that a contractual relationship among these parties is not appropriate relief. Such relief was sought in this action at the outset and denied by the judge to whom this case was formerly assigned. It is no more appropriate now than then. Equitable relief, discretionary with the court, is denied.

## VI. PRE–JUDGMENT INTEREST

In addition to the damages for Kelly's breach of the contract and Barnes' tortious interference, Reliable seeks pre-

judgment interest on compensatory damages. New Jersey law provides pre-judgment interest to compensate a plaintiff because the defendant would have had the use of the funds at the time of the actionable conduct. *See Busik v. Levine,* 63 N.J. 351, 307 A.2d 571, *app. dismissed, Levine v. Busik,* 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973). An award of pre-judgment interest is regarded as compensatory to indemnify the plaintiff for the loss of what the monies due would presumably have earned if payment had not been refused. *Rova Farms Resort, Inc. v. Investors Ins. Co. of America,* 65 N.J. 474, 323 A.2d 495 (1974). Interest compensates for the value of the sum awarded during the pre-judgment period when the defendant had the benefit of monies to which the plaintiff was entitled.

The measure of pre-judgment interest differs if the claim is in contract or in tort. In contract cases, pre-judgment interest is generally awarded in accordance with equitable principles. *See Bak-A-Lum Corp. of America v. Alcoa,* 69 N.J. 123, 131, 351 A.2d 349, 353 (1976). The court determines that plaintiff was deprived of $28,685.28 and that had Kelly not breached the contract, Reliable would have earned and been in possession of that amount no later than June, 1975. Reliable has asserted that it is entitled to an award against Kelly at the rate of 12% but has not offered adequate proof that it would have invested only at that rate. The court at its discretion determines that an interest rate of eight percent (8%) from June, 1975 is appropriate.

In tort cases, there is no statute dealing with interest upon obligations or claims based on tortious conduct; but New Jersey Supreme Court R 4:42 provides 8% per annum interest on the amount of an award from the date of the institution of the action or from a date six months after the date of the tort, whichever is later. In this instance, Barnes' tortious conduct occurred in November and December, 1974 and the action was commenced on December 23, 1974. Therefore, Reliable is entitled to pre-judgment interest from June, 1975 on the award against Barnes for compensatory damages. Prejudgment interest is not imposed on any awards of punitive damages because punitive damages are not intended to compensate for actual loss but to punish for wilful, intentional and malicious conduct.

## FINAL JUDGMENT

AND NOW, this 1st day of April, 1985, in accordance with the court's Findings of Fact and Conclusions of Law on Liability filed on March 9, 1984 and on Damages filed this day, it is ORDERED that JUDGMENT is entered:

1. On the claims of Reliable Tire Distributors, Inc. v. The Kelly Springfield Tire Company and Bobby Unser and The Barnes Tire Company, Inc. as follows:

| | |
|---|---|
| Count I | – in favor of plaintiff Reliable Tire Distributors, Inc. and against defendant The Kelly Springfield Tire Company in the amount of $61,139.80 ($28,685.28 plus prejudgment interest of $32,454.52). |
| Count II | – in favor of defendants The Kelly Springfield Tire Company and Bobby Unser and The Barnes Tire Co., Inc. |
| Count III | – in favor of defendants The Kelly Springfield Tire Company and Bobby Unser and The Barnes Tire Co., Inc. |
| Count IV | – in favor of defendants The Kelly Springfield Tire Company and Bobby Unser and The Barnes Tire Co., Inc. |
| Count V | – in favor of plaintiff Reliable Tire Distributors, Inc. and against the Barnes Tire Company, Inc. in the amount of $76,139.80 ($28,685.28 plus prejudgment interest of $32,454.52 plus punitive damages of $15,000). |
| Count VI | – in favor of defendants The Kelly Springfield Tire Company and Bobby Unser. |
| Count VII | – in favor of defendants The Kelly Springfield Tire Company and Bobby Unser. |

2. On the remaining counterclaims of Bobby Unser, Count III having been withdrawn at trial, as follows:

| | |
|---|---|
| Count I | – in favor of plaintiff Reliable Tire Distributors, Inc. |
| Count II | – in favor of plaintiff Reliable Tire Distributors, Inc. |
| Count IV | – in favor of defendant Bobby Unser and against plaintiff Reliable Tire Distributors, Inc. for royalties in the amount of $2,800. |