OLEFINS TRADING, INC., Plaintiff,

v.

HAN YANG CHEMICAL
CORP., Defendant.

Civ. 91–3615.

United States District Court,
D. New Jersey.

Feb. 11, 1993.

Eric D. Grayson, Esq., Greenwich, CT, Lewis & McKenna, Esqs., Saddle River, NJ, for plaintiff.

Kelley, Drye & Warren, Parsippany, NJ, for defendant.

## OPINION & ORDER

PISANO, United States Magistrate Judge:

## INTRODUCTION

By consent of the parties pursuant to 28 U.S.C.A. § 636 and General Rule 40, a civil jury trial was conducted before the undersigned in the above captioned matter. At the conclusion of the presentation of evidence and argument, the jury returned a verdict for plaintiff in the amount of $195,-245.55. On November 5, 1992, judgment was entered upon this verdict. This Court is now asked to decide defendant's post-trial motion for judgment as a matter of law, pursuant to Fed.R.Civ.P. 50(b), and, in the alternative, for a new trial under Fed. R.Civ.P. 59. Opposition was filed in response to defendant's motion. Oral argument was first heard regarding the motion on December 29, 1992, and then for a second time on January 25, 1993.

## BACKGROUND

This action involves a dispute over the terms of an agreement for the sale and purchase of ethylene.

Plaintiff, Olefins Trading, Inc., is a Connecticut corporation which maintains its principal place of business in the same state. (Plaintiff's Trial Brief at 5). Plaintiff is in the business of marketing and trading bulk chemicals and chemical products. Id. Olefins purchases the chemicals that it sells to petrochemical companies, such as defendant, from Olefin's supplier, Repsol Petroleo. (Tr. 1 at 8).[1] Repsol Petroleo is located in Madrid, Spain. (Plaintiff's Trial Brief at 7). Olefins hired Y.I. Han, a trader of chemicals, for the purpose of facilitating trade agreements with Korean companies such as Han Yang. Id. at 1.

Defendant, Han Yang Chemical Corp., is a Korean corporation which manufactures petrochemical products. (Defendant's Trial Brief at 1). Han Yang is registered to do business in New Jersey, and it maintains "a liaison office in the State of New Jersey, under the supervision of Shin Hyo Lee, for the purpose of sourcing chemicals in the Americas and Europe for use in its petrochemical business." Id. Defendant's terminal and import tank, however, are locat-

---

1. "Tr." connotes one of the transcripts from the trial.

   Tr. = January 25, 1993 transcript of oral argument

Tr. I = October 20, 1992 trial transcript
Tr. II = October 21, 1992 trial transcript
Tr. III = October 22, 1992 trial transcript
Tr. IV = October 23, 1992 trial transcript

ed in Yeosu, Korea. (Plaintiff's Trial Brief at 5). At these facilities defendant processes raw materials into finished goods. The agreement entered into between these two parties thus entailed the complexities of engaging in an international business transaction.

On or about March 12, 1991, plaintiff contacted defendant to negotiate for the sale of 5700 metric tons (mt) of ethylene at $950 per mt. *Id.* Ethylene is a chemical that is shipped by the ton in its gas form, in specialized tankers.[2] (Tr. I at 5). A facsimile followed memorializing the offer, and on March 13, 1991, plaintiff mailed to defendant a written confirmation. (P–5).[3]

Defendant responded to the offer with a written counterproposal for the purchase of 4500 mt of ethylene. (P–7). Thereafter, numerous phone conversations ensued and proposed written confirmations were exchanged. Negotiations became complicated by market conditions, when in April of 1991, the price of ethylene dropped rapidly.

On April 2, 1991, defendant requested that plaintiff agree to produce a reduced quantity of ethylene, thus modifying the initial agreement. This request was made due to the rapid decline in the market price of ethylene and storage capacity problems on the part of Han Yang. (Defendant's Trial Brief at 3).

By facsimile dated April 2, 1991, plaintiff indicated that a reduction in quantity was not possible. (P–14). However, plaintiff submitted a counterproposal on April 4, 1991, offering 4500 mt of ethylene at $888 per mt, if defendant would issue a commercial credit in the amount of $194,625, to be compensated to plaintiff on the parties' next transaction. (P–16). The April 4, 1991 facsimile stated:

As per our phone conversations today, we hereby confirm Hanyang [sic] Chemical's proposal and contract to be amended as follows;

Quantity: 4500 mt maximum
Price: USD888 per mt CIF Yeosu
—conditions:
1. Hanyang [sic] to issue commercial credit to Chemical Trading for the amount of USD194,625 and this amount will be compensated to us on next transaction. This amount is for out loss of FOB and deadfreight.
2. Hanyang [sic] to open L/C on April 5 in workable form.
All other terms and conditions remain same as per original contract. Please give us confirmation of above together with letter for commercial credit by return today and awaiting L/C details.

*Id.*

A second facsimile followed soon after, from Olefins to Han Yang, identical to the first except for handwritten notations changing the 4500 quantity to 4200 mt, and the $194,625 commercial credit to $238,125. (P–17).

Defendant responded to the counterproposal of April 4, 1991 with a counteroffer of its own, reflecting the quantity of 4200 mt, but it increased the price to $900 per mt. (P–18). This offer excluded mention of a commercial credit, and read in part:

We are pleased to confirm as follows;
AA) Product: ethylene
BB) Quantity: 4200 mt max
CC) Price: USD900/mt CIF Yeosu, Korea
DD) Term: 30 days after B/L date
EE) Shipment: Etd.—not earlier than Apr. 20, 1991
We appreciate your company's effort to help Han Yang Chemical Corp.

*Id.*

Shortly thereafter defendant facsimilied a revised purchase confirmation, reflecting the same quantity and price, but it included the following special conditions:

lease, and once you lease one it's hugely expensive to breach your contract with them. (Tr. 1 at 9–10).

---

**2.** In his opening statement, counsel for plaintiff stated:

Ethylene carriers are like specialized moving vans. You'll hear testimony that there are only about 44 of them in the entire world, and because of this refrigeration process and the size, they're hugely expensive to charter or

**3.** "P" represents plaintiff's numbered exhibits at trial.

This is a revised purchase confirmation for the offer No. CT–1219 which is revised offer by Olefins Trading, Inc. All other terms and conditions are same.

Our L/C will be opened not later than Apr. 8, 1991 and L/C applicant will be TGS Development Inc. P.O. Box 934, Dayton, NJ 08810.

(P–19).

Also on April 4, 1991, plaintiff responded to defendant's revised purchase confirmation, again stating that defendant must open a letter of credit[4] and issue a commercial credit in the amount of $238,125 by April 5, 1991. (P–20). This facsimile read as follows:

> We received your revised purchase order No. KXH–016. However, following must be done by Hanyang [sic] immediately within April 5, 1991.
>
> 1. L/C to be opened in workable form.
> 2. Hanyang's [sic] letter for commercial credit to Chemical/Olefins Trading for the amount of USD238,125 which to be compensated to us in next transaction as per agreed on the phone with Mr. Lee.
>
> Awaiting your confirmations.

*Id.*

Plaintiff sent a second facsimile on April 5, 1991, which read in pertinent part:

> Regarding our net loss caused by discount price and deadfreight, Hanyang [sic] must issue the letter for commercial credit for USD238,125 within today. If we do not receive letter within today, Hanyang [sic] to compensate this amount by transferring [sic] the funds to our account by next week.

(P–22).

On April 8, 1991, John MacDonald, president of Olefins, sent a letter to Han Yang declaring that defendant was in breach of their agreement. This letter stated in part:

Enclosed please find copy of contract which was fixed with your firm. Unfortunately, Hanyang [sic] was unable to comply with the terms and conditions of their contract and we, therefore, agreed to Hanyang's [sic] amended proposal dated April 4, 1991, of which a copy is also attached. This was done in order to assist Hanyang [sic].

On April 5, we received the enclosed letter which is entirely erroneous in tone and not acceptable to this firm.

Naturally, I am astonished at the lack of professionalism or honesty displayed by your Mr. Dewey Han.

I expect your company to honor their commitments and as such, I await the L/C which is to be opened today along with a letter confirming commercial settlement of our estimated losses equalling U.S. $238,125. This amount covers temporary voluntary allowance of purchase price and the estimated deadfreight claim.

(P–24).

On April 9, 1991, defendant arranged for a letter of credit to be opened in an amount sufficient to cover 4200 mt of ethylene at $900 per mt. (Defendant's Trial Brief at 5). The following message was facsimiled from Dewey Han to plaintiff on April 8, 1991:

Attached please find our L/C application. I will send you a confirmed L/C by bank tomorrow. The reason why the L/C applicant is Golden Bell U.S.A. Co., Inc. instead of TGS Development, Inc. is that we are requesting to Mani–Hani to open this L/C with our credit not back to back.

In fact, we still did not receive the master L/C from our head office.

In addition, please kindly tell your president, Mr. MacDonald that I am not a person who has a lack of professionalism

---

**4.** Neither party disputes that the method of payment in this transaction was to be by letter of credit. (Defendant's Trial Brief at 9). Counsel for plaintiff explained Olefins' preference for using letters of credit:

> [I]t's an agreement from a bank that they will pay the seller, for instance us, Olefins.... It's essentially an international financing way

to make sure that in large transactions like this people get paid as opposed to loading Ethylene on a ship, shipping it over for 30 days and then having you send me a check. Instead of someone sending you a check, you just walk into your local bank and hand them certain documents and you get paid.

(Tr. 1 at 6–7).

or honesty. I think he does not need to astonished [sic] at all.

(P-26).

On April 22, 1991, 4,174 at of ethylene were loaded and delivered to defendant. (Plaintiff's Trial Brief at 13). On May 30, 1991, plaintiff sent defendant an invoice for $62,613.21 in lost profits and $170,625.00 in deadfreight.[5] The total amount of the invoice came to $233,238.21. (P-48). On August 7, 1991, plaintiff issued a revised invoice to defendant, which reflected an increase in deadfreight charges for which Repsol had billed plaintiff on July 31, 1991. (P-50, 51). The total amount of the revised bill came to $234,249.00 *Id.*, representing what Olefins contended were its lost profit and deadfreight obligations over and above the amount actually paid by Han Yang for the quantity of ethylene shipped and received.

Plaintiff filed suit in this Court on August 15, 1991. Plaintiff contends that Han Yang agreed to open a letter of credit in the amount of $4,117,500 by March 15, 1991, which it failed to do. Defendant claims that it did not breach the contract. Defendant argues that the modified agreement of April 4, 1991 took the place of the March 15, 1991 contract, and provided merely for the purchase by defendant of the 4200 mt of ethylene. Defendant denies that it agreed to extend a commercial credit on any "next" transaction.

On October 20, 1992, this matter went to trial. On October 26, 1992, a verdict was reached and the jury returned an award of $195,245.55 in favor of plaintiff. Judgment was entered on this award on November 5, 1992.

At the close of plaintiff's case and again at the close of all evidence, defendant moved for judgment as a matter of law, pursuant to *Fed.R.Civ.P.* 50(a). This Court denied defendant's motion with respect to the breach of contract claim, but reserved

decision on the issue of claimed "deadfreight".

Defendant presently has pending a post trial motion for judgment as a matter of law, pursuant to *Fed.R.Civ.P.* 50(b), and, in the alternative, for a new trial under *Fed.R.Civ.P.* 59. For the foregoing reasons, defendant's motion for judgment as a matter of law is granted.

## ANALYSIS

### *Fed.R.Civ.P. 50(a) Judgment As A Matter of Law*

*Fed.R.Civ.P.* 50(a)(1) provides:

If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion, for judgment as a matter of law against that party on any claim, counterclaim, crossclaim, or third party claim that cannot under the controlling law be maintained without a favorable finding on that issue. *Id.*

There are two situations in which Rule 50(a) motions are commonly made. The first arises where a party claims there is a "complete absence of pleading or proof on an issue or issues material to the cause of action or defense." James Wm. Moore, *2A Moore's Federal Practice*, § 50.02 (2d ed. 1992-93). The second situation occurs where it is argued that "there are no controverted issues of fact upon which reasonable jurors could differ." *Id.* The first situation is applicable to the case at bar.

When deciding a motion for judgment as a matter of law, "the trial judge must determine whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict." *Bhaya v. Westinghouse*

---

5. Deadfreight is the amount of unused space on a ship, space not loaded with merchandise. Counsel for plaintiff explained the concept of deadfreight in his opening statement as follows:

The ship ... is much like a specialized moving van. If you tell them it's going to come to my house, you hire the whole moving van,

and what you do is you pay for the entire space. If you do not load the entire moving van, the mover, or in this case the ship, will still charge you the one price for having to bring his truck or his ship to your house.... This is called deadfreight.

(Tr. 1 at 13-14).

*Elec. Corp.*, 832 F.2d 258, 258–59 (3d Cir. 1987). *See also Rotondo v. Keene Corp.*, 956 F.2d 436 (3d Cir.1992). The motion should be denied if "the record contains the minimum quantum of evidence from which a jury might reasonably afford relief." *Keith v. Truck Stops Corp.*, 909 F.2d 743, 745 (3d Cir.1990). *See also Dawson v. Chrysler Corp.*, 630 F.2d 950, 959 (3d Cir. 1980) (denial of motion affirmed "unless record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief"). In *Brady v. Southern Railroad*, 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943), the United States Supreme Court stated the standard for a Rule 50 motion in the following terms:

> When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict. By such direction of the trial, the result is saved from the mischance of speculation over legally unfounded claims.

*Id.* at 479–80, 64 S.Ct. at 234.

In the instant case, the jury returned a verdict of $195,245.55 in favor of plaintiff. The amount of this verdict attributable to damages for deadfreight was $132,632.34. The remainder of the verdict, $62,613.21, was awarded to plaintiff as lost profits. Upon a careful review of the record, and after having heard two separate occasions of oral argument, during the second of which counsel for plaintiff was given the specific opportunity to apprise the court of any evidence on the record supporting the award of damages returned by the jury, this Court has concluded that the record fails to support any rational basis for the jury's verdict.

### Commercial Credit

■ This dispute concerns an alleged breach of contract between two merchants involving the shipment of petrochemical products. The Uniform Commercial Code, Article 2, governs contracts "for the sale of goods for the price of $500 or more...." UCC § 2–201(1). In particular, UCC § 2–207(2) is applicable to the facts at bar, where the parties' performance demonstrates the existence of a contract, yet a dispute has arisen as to the nature of its terms. *See Step–Saver Data Systems, Inc. v. Wyse Tech.*, 939 F.2d 91, 98 (3d Cir.1991). Section 2–207 has been held to determine the terms of a contract "[w]hen the parties's [sic] conduct establishes a contract, but the parties have failed to adopt expressly a particular writing as the terms of their agreement, and the writings exchanged by the parties do not agree...." *Id.* N.J.S.A. 12A:2–207 provides:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
> > (a) the offer expressly limits acceptance to the terms of the offer;
> >
> > (b) they materially alter it; or
> >
> > (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

*Id.*

In the instant case a contract was formed by the exchange of writings that took place on April 4, 1991. Exhibit P–18, sent by defendant to plaintiff, proposed the shipment of 4200 mt of ethylene at $900 per mt. A revised purchase order, P–19, was also sent by defendant before plaintiff had a chance to respond, which kept constant the price and quantity of P–18, but also included as an additional term the fact that the letter of credit was to be opened not later than April 8, 1991. Plaintiff then

answered defendant's counter-offer with P–20, which differed from P–19 only in the respect that it demanded the letter of credit to be opened in workable form, and that a commercial credit was to be forthcoming upon the parties' next transaction. No change was made to the price and quantity of ethylene.

UCC § 2–207 has been interpreted to state that:

> [P]roceeding with a contract after receiving a writing that purports to define the terms of the parties's [sic] contract is not sufficient to establish the party's consent to the terms of the writing to the extent that the terms of the writing either add to, or differ from, the terms detailed in the parties's [sic] earlier writings or discussions.

*Step–Saver*, 939 F.2d at 99. Thus, additional terms in a written confirmation which " 'materially alter [the contract]' are construed 'as proposals for addition to the contract', not as conditional acceptances." *Id.* at 101, quoting UCC § 2–207(2)(b).

Based upon the above facts, the jury was charged as follows:

> In order to find for the plaintiff on this claim, you must first find, from all the evidence presented, that the defendant Han Yang agreed to provide such a commercial credit. In order to determine whether a commercial credit term was part of the modified contract, you should consider whether such a term materially altered the parties' agreement or whether the defendant notified the plaintiff of its objection to the inclusion of such a term. If you find that such a term materially altered the agreement, or that the defendant properly objected to it, then you must find that it was not part of the

agreement between the parties and you must return a verdict for the defendant. (Tr. IV at 127).

The jury returned the special verdict questionnaire, finding that Han Yang had breached a material term of the April 4, 1991 agreement by not providing a commercial credit by April 5, 1991. By finding that this breach was a material one, the jury indicated that it thought the commercial credit was itself a material term. Material terms, however, posed as additions to a contract, cannot become part of the contract unless agreed to by the offeree, pursuant to UCC 2–207(2)(b). The jury's verdict is thus contrary to the dictates of the law [6], and as such cannot stand.

### Lost Profits

On October 23, 1992, the jury was instructed, in part:

> In determining the measure of damages, you must determine the amount which reasonably resulted from any material breach of contract by Han Yang. You may not award as damages any amount that plaintiff has not proven he has suffered and incurred by virtue of such breach or which you may only arrive at through sheer conjecture. The other way of looking at damages is the law allows an injured party to be placed in as good a position as it would have been had the contract been performed as agreed.

> I instruct you that the law allows an injured party to recover its lost profits and any other reasonable foreseeable damages that it sustained by virtue of the breach. These damages are sometimes called incidental damages. And, in this case, we have a claim for deadfreight, which is considered an amount

---

**6.** The rationale behind upholding the principles of the UCC and not leaving them to the whim of a jury was aptly put by the court in *Mead Corp. v. McNally–Pittsburgh Mfg. Corp.*, 654 F.2d 1197, 1206 (6th Cir.1981):

> Absent the [UCC], questions of contract formation and intent remain factual issues to be resolved by the trier of fact after careful review of the evidence. However, the [UCC] provides *rules of law*, and section 2–207 establishes important legal principles to be em-

ployed to resolve complex contract disputes arising from the exchange of business forms. Section 2–207 was intended to provide some degree of certainty in this otherwise ambiguous area of contract law. In our view, *it is* unreasonable and contrary to the policy behind the [UCC] merely to turn the issue over to the uninformed speculation of the jury left to apply its own particular sense of equity. *Id.* at 1206.

paid in transportation of goods which is one such form of incidental damages. (Tr. IV at 124). Then in the verdict form, the jury was asked the following:

3. Was there a contract on April 4, 1991 between the parties for the sale of 4200 metric tons of ethylene?

Yes_X_ No___

(A) If yes, did such agreement take the place of a prior agreement?

Yes_X_ No___

The jury found, therefore, that the April 4, 1991 contract superseded the March 13, 1991 agreement. The April 4th contract called for 4200 mt of ethylene at $900 per mt, but only 4174.21 mt was actually loaded and delivered to Han Yang. Defendant paid $900 per mt for the full delivery on this contract. Thus, plaintiff suffered no loss of profits on this transaction.

■ It is well-settled that when a contract has been breached, the non-breaching party has a right to recover the lost profits it reasonably expected to earn under the contract. *See Reliable Tire Distributors, Inc. v. The Kelly Springfield Tire Co.*, 607 F.Supp. 361, 367 (E.D.Pa.1985); *Bak–A–Lum Corp. v. Alcon Building Products*, 69 N.J. 123, 351 A.2d 349 (1976). The non-breaching party has the burden of proving the amount of damages it has suffered, and also that the damages are the direct and proximate result of the breach. *Reliable Tire*, 607 F.Supp. at 367.

In the instant case, the April 4, 1991 contract superseded the March 13, 1991 agreement. The extension of a commercial credit, an additional and material term, did not become part of the April 4, 1991 contract by virtue of its materiality, pursuant to UCC § 2–207(2)(b).

■ The jury apparently based the lost profits award on the price difference between the March 13th contract ($915) and the April 4th contract ($900), and then multiplied that difference ($15) by the amount delivered (4174.21 mt). The jury had already found, however, that the March 13th contract was superseded by the April 4th

contract. Once it has been found that a modified contract was entered into, damages cannot be awarded on a prior, superseded agreement. Furthermore, the jury was instructed that damages can only be awarded upon the breach of a contract. As no breach occurred in the April 4, 1991 contract, the award of damages for lost profits must be overturned.

### Deadfreight

■ The jury granted plaintiff damages for the cost of deadfreight in the amount of $132,632.34. With respect to awarding damages for deadfreight, the court had instructed the jury:

In order to find the defendant liable to the plaintiff for dead freight charges, it must first be proven that plaintiff had the duty to pay dead freight to the vessel charterer, and second, that the parties to this contract agreed that the defendant would be responsible for any dead freight to be paid by the plaintiff.

In this particular case, the plaintiff has adduced testimony that it recognizes the deadfreight charge by Repsol as its obligation. In order to find that the defendant Han Yang is liable to plaintiff for deadfreight, you must first determine whether the plaintiff is bound to pay Repsol for its deadfreight claim and that the defendant Han Yang agreed to the deadfreight charge as a term of the contract between the parties.

Further, the plaintiff's claim for deadfreight may only be considered by you if you find that the defendant has committed a breach of the contract for the purchase of ethylene.

(Tr. IV at 130–31). Based upon the above instructions, therefore, the jury must have come to the conclusion that Olefins had a legal obligation to pay Repsol for the cost of deadfreight, that Han Yang agreed to compensate Olefins for deadfreight as part of their April 4, 1991 contract, and that defendant has breached the April 4th contract.[7]

At the second round of oral argument held on defendant's post-trial motions, this

---

7. Deadfreight can be awarded as incidental damages pursuant to UCC § 2–710 under cir-

cumstances when the party has not actually paid the claim, but only if a factual finding is

Court made counsel aware of the inconsistencies in the jury verdict, as it asked the following:

Consequently, we are faced with the issue of not only whether this plaintiff Olefins must have a legal obligation sufficient to justify an incidental damage claim against the defendant, but we are compounded by whether Repsol, the claimant against Olefins, has demonstrated with sufficient clarity that it has an obligation and, therefore, that its demand to Olefins was justified and can be legally transferable as an incidental damage claim against this defendant.

Then we get into the second problem I have with the deadfreight claim, which is that I believe it was argued throughout that the deadfreight claim was being argued as an element of incidental damages ... and logically I am wondering whether there can be any incidental damage claim when, as we have just discussed, there has been no breach of the agreement.

. . . .

All of that being said, Mr. Grayson, is there anything in this record you can point me to from which I can conclude that the jury was justified in finding the commercial credit to be a material term of the agreement which was breached by the defendant? And that, of course, assumes and implies that the defendant should have agreed to it, or from which this jury could find that the defendant agreed to pay the deadfreight as a term of the agreement between the parties.

(Tr. at 11–13).

■ In response to this query, counsel for plaintiff answered that defendant had

made that the payment of deadfreight is a legally binding obligation. To the extent that *Peoples' Democratic Repub. of Yemen v. Goodpasture, Inc.*, 782 F.2d 346 (2d Cir.1986) holds to the contrary, this Court declines to follow it.

Plaintiff's deadfreight obligation in this case was not demonstrated to be binding. Roger Bowgen, Vice President of Olefins Trading, testified that the claim was asserted by Repsol, the charterer of the vessel. Yet plaintiff has failed to offer any proof by which the jury could find that Repsol was billed for, or had paid, the deadfreight claim of the vessel owner.

agreed to pay a lump sum for the deadfreight, and that the deadfreight was subsumed within the commercial credit argument. (Tr. at 27). The Court then asked, "[i]s it your position then that if I find that there can be no commercial credit components to this damage award, then there can no longer be a deadfreight claim?", to which counsel responded:

I wouldn't think that would be correct. . . . Because you can't read the two contracts apart. You have to read—you have to look at the whole record together. It's not, well, they waived their rights under the first contract, so you can't think about it, because that is not the way the record reads.

(Tr. at 28).

Plaintiff's argument is without a basis in the law. The April 4, 1991 contract superseded the March 13, 1991 agreement. The March 13, 1991 contract thus no longer exists. Absent evidence that the April 4, 1991 contract was to include certain terms of the March 13, 1991 contract, these two agreements cannot be read in conjunction with one another.[8] As this Court can find no evidence on record that Han Yang ever agreed to compensate plaintiff for the cost of deadfreight in the April 4, 1991 contract, the part of the jury's verdict awarding such damages will be overturned.

Because judgement was granted as a matter of law, this Court need not reach the merits of defendant's motion for a new trial, pursuant to *Fed.R.Civ.P.* 59.

## CONCLUSION

For the reasons set forth above, it is hereby

This Court therefore could have granted defendant's motion made at the close of plaintiff's case and at the close of all the evidence for judgment as a matter of law on the deadfreight claim. Since defendant's motion is being granted for more basic reasons, however, a ruling need not be made on this issue.

8. Counsel admits that he "never argued, nor was the jury instructed that there could be a partial waiver of some of the terms of the first contract, and that other terms of the first contract were to be included in the second contract. That is nowhere in the case." (Tr. at 29).

ORDERED that the verdict returned by the jury be set aside, and the judgment entered by this Court in the amount of $195,245.55 be vacated;  and it is further

ORDERED that defendant's motion for judgment as a matter of law be granted pursuant to *Fed.R.Civ.P.* 50(b).